**OMEGA ENGINEERING, INC.**

v.

**EASTMAN KODAK COMPANY.**

No. 5:90 CV 554(JGM).

United States District Court,
D. Connecticut.

July 9, 1998.

232

Daniel J. Kelly, Robert A. Trevisani, William A. Zucker, Leigh A. Gilligan, Gadsby & Hannah, Boston, MA, James R. Fogarty, Epstein Fogarty Cohen & Selby, Greenwich, CT, W. James Cousins, McGowan & Cousins,

Wilton, CT, for Omega Engineering, Inc., plaintiffs.

Benjamin A. Solnit, George E. O'Brien, Jr., Christopher P. McCormack, Christine D. Marsching, Tyler, Cooper & Alcorn, New Haven, CT, Harold A. Kurland, Nixon, Hargrave, Devans & Doyle, Rochester, NY, for Eastman Kodak Company, defendant.

David E. Rosengren, Anthony J. Natale, Pepe & Hazard, Hartford, CT, for Mit Dev. Corp., intervenor-defendant.

Chase T. Rogers, Cummings & Lockwood, Stamford, CT, for Price Waterhouse, movant.

## MEMORANDUM OF DECISION

MARGOLIS, United States Magistrate Judge.

On November 2, 1990, plaintiff Omega Engineering, Inc. [ "Omega" ] commenced this action against Eastman Kodak Company and Ultra Technologies, Inc. [collectively "Kodak"]. On April 13, 1995, Omega filed its Third Amended Complaint (Dkt.# 246), alleging breach of contract (Count One), breach of covenant of good faith and fair dealing (Count Two), promissory estoppel (Count Three), breach of warranty regarding shelf life (Count Four), breach of warranty regarding leakage (Count Five), fraud (Count Six), negligent misrepresentation (Count Seven), Lanham Act violations (Count Eight) and violation of Connecticut Unfair Trade Practices Act (Count Nine). On May 12, 1995, Kodak filed its Answer to the Third Amended Complaint (Dkt.# 247), setting forth eight affirmative defenses and asserting counterclaims for breach of contract (First Counterclaim) and restitution or unjust enrichment (Second Counterclaim).

On December 1, 1995, then Chief Judge Peter C. Dorsey granted summary judgment in favor of defendants on Counts One and Two. As to Count One alleging breach of contract for an alleged requirements contract, Judge Dorsey held that the Statute of Frauds was not satisfied insofar as "[n]o

writing that might bind Kodak contains such a quantity term." *Omega Eng'g, Inc., v. Eastman Kodak Co.,* 908 F.Supp. 1084, 1090 (D.Conn.1995).[1] As to Count Two alleging breach of the duty of good faith and fair dealing, Judge Dorsey held that "[b]ecause [the requirements contract in Count One] is unenforceable, it is not a basis for applying the duty of good faith and fair dealing to the Ultralife transactions." *Id.* at 1091.

On December 21, 1995, the case was referred to this Magistrate Judge for trial and all pending motions. (Dkt. # 282. *See also* Dkt. # 297, Table 18 & 12/16/96 endorsement thereon). On September 9, 1996, a court trial was commenced and continued through thirteen court days, concluding on September 27, 1996. (Dkt.## 298–306, 310–28).[2] On January 15, 1997, a briefing conference was held in which deadlines for post-trial submissions were agreed upon. (Dkt.# 329). On June 3, 1997, Omega filed its post-trial brief and proposed findings of fact and conclusions of law. (Dkt. ## 333 & 334). On August 8, 1997, Kodak filed its own post-trial brief and proposed findings of fact and conclusions of law. (Dkt. ## 336 & 337). In a letter to the Court dated September 4, 1997, Omega advised the Court that it "elected not to file a reply trial brief [insofar as] all issues and arguments raised by Kodak in its trial brief have been addressed by Omega in its previous submissions."

For the reasons stated below, judgment shall enter for defendant Kodak on Omega's Complaint and for Kodak on its Counterclaim in the amount of $36,720.

## I. FINDINGS OF FACT

The following constitutes the Court's findings of fact, pursuant to FED. R. CIV. P. 52(a):

Omega is a seller of scientific measurement and control instruments located in Stamford, Connecticut; the company was founded in 1962 by Mrs. Betty Hollander.

---

**1.** *See also Omega Eng'g, Inc. v. Eastman Kodak Co.,* Civ. No. B–90–554, 1991 WL 218456 (D.Conn. Aug.20, 1991)(Eginton, J.)(concerning original complaint).

**2.** The transcripts (Dkt. ## 326–18, 320–28) are referred to as "9/9/96 Tr.," etc. Omega's exhibits are listed numerically, beginning with the number 1; Kodak's exhibits are listed numerically, beginning with the number 501.

(9/20/96 Tr. at 93, 96). Today, Omega has 1,000 employees and sells more than 60,000 different products, primarily measurement and control instruments. (9/25/96 Tr. at 96). Omega markets a wide variety of hand-held meters and instruments that operate utilizing 9–volt batteries which Omega supplies to its customers at no additional charge. (9/17/96 Tr. at 8–10; Exh. 127). Kodak is a well-known manufacturer of photographic products employing thousands of people worldwide. (Dkt. # 297, Tab 5, ¶ 1).

## A. DEVELOPMENT AND INITIAL PROMOTION OF ULTRALIFE BATTERY

In 1984, Kodak authorized Venture Project Delta to develop a consumer 9–volt lithium battery [the "Ultralife" or "U9VL"]. Venture Project Delta eventually was renamed Ultra Technologies, Inc. and in its infancy its staff primarily consisted of the following people: James Moxley, president; Marty Adams, marketing; Paul Desborough, finance; Peter Clark and Hank Heirigs, technical support. (9/9/96 Tr. at 16–22, 37–39. *See also* Exhs. 2–3, 5–6, 637). Kodak's facility in Newark, New York was comprised of 218 acres and several buildings which contained offices, research and development facilities and a storage and warehousing complex. (9/9/96 Tr. at 35–37; 9/10/96 Tr. at 42).

On May 22, 1986, Kodak announced its entry into the consumer battery business at a press conference at New York's World Trade Center. (9/9/96 Tr. at 59–60, 62; Exh. 8; *see also* Exhs. 9–11, 13–14, 737–38, 748, 751). In attendance at the press conference were Kodak Executive Officer William Prezzano, Kodak Corporate Communications Executive R.S. Bartlett; Ultra Technologies representatives Moxley, Clark, Adams, and Heirigs;

and media representatives from print, radio and television. (9/9/96 Tr. at 60–62; Exh. 8, at 1). Besides the Ultralife 9–volt lithium battery, Kodak's battery product line included alkaline batteries, known as the Supralife, which Kodak did not manufacture itself. (Exhs. 9–11 & 15). The press announcement script indicated that Kodak had "perfected *an interconnect cover.*" (Exh. 8, at 10 (emphasis in original); *see also* 9/9/96 Tr. at 63–64). The script also stated that "lithium cells provide *better* long-rest, intermittent usage." (Exh. 8, at 8)(emphasis in original).[3] At the time of the announcement, Kodak was "prepared to start selling batteries," although it did not have the ability to actually produce the Ultralife at that time. (9/9/96 Tr. at 62–63).[4]

## B. OMEGA'S INTEREST AND OEM BROCHURES

Early press attention surrounding Kodak's announcement was viewed by Mrs. Hollander's husband, Dr. Milton Hollander, himself a co-owner, director, advisor and technical consultant for Omega. (9/25/96 Tr. at 128–29, 130–31). Dr. Hollander "pressured" the company to include the Ultralife in its products because he thought it "would absolutely be a positive thing for Omega to put with its instruments, because Omega has always been considered a state of the art company, and you would always get the latest technology. It seemed only natural that this battery would be ideal for Omega." (9/25/96 Tr. at 131). Shortly after the announcement, Omega contacted Kodak for information. (9/25/96 Tr. at 131–32). The information initially forwarded to Omega included a brochure entitled "Announcing a Major Breakthrough in Power Cell Technology" [ "First OEM Brochure" ],[5] some sample batteries and an early Engineering Specification. (9/17/96 Tr. at

---

3. Kodak made other statements around this same time regarding battery characteristics, *see* Dkt. # 333, at 3–8, claiming: "product differentiation," "perfected a total new power cell design," "perfected an interconnect cover fitting the battery top," "impermeability," and that Kodak expected to be in the battery business for the "long run." *See also* Exhs. 704, 708, 713, 732, 734–36.

4. Prezzano stated that "we believe this [expanding battery] market ... will welcome a name

brand supplier like Kodak offering innovative products." (Exh. 8, at 6). This statement revealed what turned out to be Kodak's extreme underestimation of the strength of established battery manufacturers in competing in this market.

5. OEM is the abbreviation for "Original Equipment Manufacturer." (Dkt. # 297, Tab 5, ¶ 11; 9/11/96 Tr. at 149).

35; 9/25/96 Tr. at 131–32, 180–81; Exhs. 6 & 15–16). Significantly, John Linney, Omega's purchasing vice president, testified that Omega committed to purchase the lithium batteries even before they received product literature about the batteries or any samples of batteries. (Exh. 741, at 122, 206–07; *see also* 9/17/96 Tr. at 71). That commitment was consistent with the Hollanders' high level of interest in the Ultralife. In this manner, the First OEM Brochure was not made a part of the basis of the bargain between Omega and Kodak.

The First OEM Brochure was produced specifically for the industrial market to provide customers with technical data showing various characteristics of the battery. (9/11/96 Tr. at 160–62; Exh. 15). Adams and Paul Dickinson, head of Ultra Technologies' OEM Sales, had responsibility for the accuracy of the content of the First OEM Brochure. (9/10/96 Tr. at 109; 9/11/96 Tr. at 147–48, 160–61). The arrayed data included continuous discharge charts at various voltage loads [ "Discharge Curves" ] which indicated that the Ultralife had superior service life in tests over a continuous discharge. (Exh. 15). Besides the Discharge Curves, the First OEM Brochure included a chart showing capacity retention over time which indicated that the Ultralife retained eighty percent of its capacity after ten years. Directly beneath the capacity retention chart was the following additional information: "Retained capacity based on estimated data from accelerated storage tests." (*Id.*). The brochure also stated that the Ultralife is "an excellent choice for long-rest, intermittent application." (*Id.*).

Kodak published a second brochure intended for the industrial market in May 1987 [ "Second OEM Brochure" ]. (Exh. 34. *See also* Exhs. 727–31). Like the First OEM Brochure, it was intended as promotional literature and was reviewed by Dickinson and Adams for accuracy prior to publication. (9/10/96 Tr. at 111–12; 9/11/96 Tr. at 186–87). Again, the Second OEM Brochure made claims of ten-year shelf life, benefits for intermittent use applications and impermeability. (Exh. 34). Of particular note was that the "estimated data" language was removed from the capacity retention chart.

A third industrial brochure [ "Third OEM Brochure" ] was issued in June 1988; this time, Heirigs was responsible for collecting and substantiating the data incorporated in it. (9/19/96 Tr. at 197–98; Exh. 63). A fourth brochure was issued toward the end of 1988 and Heirigs was similarly responsible for data and content. (9/19/96 Tr. at 198; Exh. 83).

## C. "SHELF LIFE" & TESTING THEREOF

The "capacity retention" referred to in the First OEM Brochure relates to "shelf life" which has been described differently by several witnesses. For example, Moxley in his direct testimony described it as the time a battery sits on a shelf, *including* any periods that a battery is stored after being put into service. (9/9/96 Tr. at 24–26)(emphasis added). Later in his direct testimony, Moxley retreated a bit, describing shelf life as the time between when a person buys a battery and the time it is put into service, characterizing the intermittent use as a "service life issue." (9/9/96 Tr. at 97–99). Dr. Boone Owens, Omega's technical expert (Exh. 210), testified that "the shelf life definition ... doesn't really consider sporadic use. It is really the maximum length of time the battery could sit and then be put into a use condition, and deliver 80 percent of what would have been delivered as a fresh battery." (9/17/96 Tr. at 168). Dr. Sumner Wolsky, Kodak's battery expert (Exh. 650), testified that once a battery has been put into use in a particular device such as a meter, "it becomes service life under whatever duty cycle you're using." (9/24/96 Tr. at 23). The Court finds that references to shelf life include only that period of time from manufacture up to the point when a battery is placed into use in a device, there being insufficient proof that it would include any time after that.

Shelf life claims were based upon basic research, microcalorimetry and accelerated aging testing done at Kodak laboratories; these procedures included "a considerable amount of testing of products that we would

manufacture." (9/26/96 Tr. at 227–28). Presumably that testing included Kodak's incorporation of the "two-thirds A"-size lithium battery used in the Kodak disc camera. Although real-time testing would have been the most accurate method of testing shelf life of batteries because it was a method of direct analysis, the two other approaches used by Kodak (microcalorimetry and Arrhenius testing) were acceptable to the scientific community. For example, plaintiff's technical expert, Dr. Owens, testified that he published articles concerning the use of microcalorimetry to test battery performance and felt that it "was a great technique to use to study batteries," although he was critical of it because it was an "indirect" method of testing. (9/18/96 Tr. at 78, 88–89; 9/17/96 Tr. at 170–73). Dr. Wolsky, Kodak's expert, agreed that microcalorimetry was "generally accepted in the battery industry as of the early '80's." (9/24/96 Tr. at 26). He testified that Arrhenius testing was also generally accepted as a technique for estimating the long-term performance of the battery. (*Id.*) Again, Dr. Owens testified that Arrhenius plot analysis was a general technique used for extrapolating data from higher temperatures to lower temperatures. (9/18/96 Tr. at 134–35). Accordingly, the Court finds that it was reasonable for Kodak to rely on these generally accepted methods for estimating shelf life characteristics of the Ultralife.

The experts disagreed as to whether the technical reports supported the claim for a ten-year shelf life. Dr. Owens strongly believed that the test data available at various points in time did not support the shelf life claims made as of those dates. (9/17/96 Tr. at 195–205). It was evident that Dr. Owens' opinion was based upon review of selected research reports, especially Exhs. 2–3, which contained references to potential problems, rather than the entire panoply of technical data amassed by Kodak. (9/17/96 Tr. at 197; *see also* Exhs. 5, 20, 21, 35, 36, 39, 43, 44, 59). In addition, there were obvious limitations in the studies relied upon by Dr. Owens. (*See* Dkt. # 336, at 13–14). Moreover, while Exhs. 2–3 point out some potential weaknesses regarding the development of the U9VL, the exhibits also support Kodak's claims. For example, Exh. 3 states: "The room

temperature storage goal of [less than] 2% capacity loss per year can be attained with the $Li/MnO_2$ chemistry. This has been demonstrated by real-time discharge testing of $LiMnO_2$ 2/3A jelly roll cells." (Exh. 3, at 17).

In contrast to Dr. Owens' testimony, Dr. Wolsky testified credibly, based on generally accepted scientific data, that the ten-year shelf life claims made in the spring of 1986 and in the First OEM Brochure were reasonable claims. (9/24/96 Tr. at 25–27). No credible evidence was presented to refute the reasonableness of the shelf life claims being made in 1986 through early 1987. Then, in 1987, Kodak undertook to study a significant number of U9VL batteries with "the intent of the study being reported herein to provide the baseline data which supports the [ten-year shelf life claim]." (Exh. 39, at Bates # 020306). The study resulted in "an estimate for product shelf life of 17.6 years." (*Id.* at Bates # 020314). This testing, which culminated in the Technical Reports admitted as Exhs. 35 & 39, happened to coincide with the first delivery of Ultralife batteries to Omega. Thus, while Omega claims it received a battery whose shelf life could not be substantiated by Kodak testing results, in reality, those results more than supported defendant's claims.

With respect to claims made before that time, the Court finds that they were reasonable claims made in the course of developing and marketing the Ultralife. At the time they were made, the estimates were based upon reasonable projections, previous experience and with the expectation that whatever "kinks" were encountered before actual product delivery would be worked out in the manufacturing process. As it turned out for Kodak, and as discussed in Section I.H. *infra*, Kodak was never able to work out the manufacturing process in an economically feasible manner.

### D. LEAKAGE

Another important characteristic of the Ultralife battery was the design of the battery casing and cover to prevent leaking. This characteristic is somewhat related to "hermeticity," "corrosion," "impermeability" and

"leakage." Kodak represented at the press announcement that it had "designed and perfected an interconnect cover fitting the battery top. This provides a series connection of the three cells and hermetic sealing of contacts within the casing to prevent leaking." (9/9/96 Tr. at 84; Exh. 8, at 10). The scripted material of the press announcement also pointed out that "we plan to test our power cells for any minute leaking off the [manufacturing] line . . . store for two weeks . . . and then re-test—a standard *above* most industry practices." (Exh. 8, at 10)(emphasis in original). In another press release tailored for a more technically oriented audience, Kodak represented that "the tightly-sealed Ultralife lithium cells retain virtually all their power, even if stored 10 years or longer." (Exh. 11, at 2). The various statements regarding "impermeability" do not mean that the Ultralife was "literally" impermeable. Rather, they offered a comparison for sophisticated buyers to judge the product differentiation of the lithium battery.

## E. ACCURACY OF KODAK STATEMENTS

The Kodak witnesses all testified credibly that they believed the battery characteristic claims to be true when they were made. For example, Moxley testified that the scripted statement at the press announcement in May 1986 included the statement that the Ultralife has a *"much longer shelf life,* . . . up to ten years compared to about three years for an alkaline battery." (9/9/96 Tr. at 70; Exh. 8, at 9 (emphasis in original)). Moxley said he believed that the statement was true. (9/9/96 Tr. at 70–71). In addition, Moxley consulted with Clark regarding the accuracy of the statements made at the press announcement and "Clark assured me that the statements were correct." (9/9/96 Tr. at 122). Adams stated that, as vice president of advertising, he never felt that he was put into a position where he had to misrepresent or mislead the characteristics of the battery to any customer. (9/11/96 Tr. at 22). Adams believed all the advertising issued to customers was accurate, based upon the best state of knowledge Kodak had at the time the statements were made; he testified that he never knowingly misrepresented a character-

istic of the Ultralife. (9/11/96 Tr. at 49). Dickinson testified that he tried to be "straight forward and honest with [Omega]," did not try to knowingly mislead Omega about anything, was never instructed to hide information from Omega, and always tried to be fair, truthful and direct in dealing with Omega. (9/12/96 Tr. at 180, 197). Indeed, as Adams testified, to misrepresent the Ultralife's characteristics "could create all kinds of problems, customer dissatisfaction, disruption, discredit on the company, discredit on [Kodak's] valuable brand name." (9/11/96 Tr. at 49–50). Thus, the Court holds that Kodak representatives did not know that any statements regarding battery characteristics were untrue.

Despite believing that the performance claims were true when made, Kodak representatives were aware that there were problems arising from manufacturing inconsistencies. For example, Moxley testified that the Ultralife "development was not sufficiently completed such that we could manufacture the products consistently in the high quantities to substantiate the kind of performance that we wanted to have, repeatable performance, battery after battery." (9/9/96 Tr. at 109). As a new product, the Ultralife went through the normal array of development problems for batteries, including leaks and other deficiencies. (9/19/96 Tr. at 113, 191). Through a series of quality assurance checks on the manufacturing line, Kodak attempted to eliminate any deficient batteries. (9/19/96 Tr. at 191–94). This led to low manufacturing yields and, in turn, made the manufacture of the Ultralife somewhat unprofitable. (9/27/96 Tr. at 21–22, 129).

In addition, Omega introduced into evidence several technical reports that were prepared before the May 1986 press announcement. In Exh. 2, Jake Voycheck, an Ultra Technologies technical support person, studied the Ultralife's permeability and leakage in connection with the product's development. He summarized: "Most of the studies conducted to date have to be questioned since it has been demonstrated that a major limiting factor is the hermeticity of the seal at the perimeter of the interconnect cover." (Exh. 2, at Bates # K017353). In another

report, Kodak Research Labs "strongly recommended that corrosion studies of the stainless steel cathode current collectors be initiated, since grid corrosion is a prime suspect of battery instability at room and elevated temperatures." (Exh. 3, at Bates # K016270).

Other technical reports were prepared at various times after the press announcement and introduced by Omega. For example, Exh. 17 is a report on the "9 Volt Lithium Stability Program," dated July 22, 1986, which references a change in electrolyte and states: "In this author['s] opinion, evidence collected to date points toward the salt as being the primary source of instability, although the exact mechanism is not clearly understood." (Exh. 17, at Bates # K016815). In March 1987, Kamal Sarbadhikari, a manager in the technical support organization reporting to Clark, drafted a memorandum regarding "U9VL Advertising Claims, 2X alkaline, 10 year Shelf Life," which references a change in electrolyte around the time of the press announcement "after determining that the original electrolyte was unacceptable for stability." (Exh. 31, at Bates # UL5959).[6]

As stated above, although Exhs. 2–3 identified some potential limitations, they also tended to support Kodak's performance claims. Moreover, they do not account for the development and improvements made in the batteries prior to shipment. Despite their awareness of problems related to manufacturing inconsistencies, Kodak managers felt that the performance claims were met with respect to the batteries released for sale. In this manner, the internal technical reports which raised questions with respect to battery performance were not "red flags" regarding the performance of batteries eventually shipped to customers.

## F. OMEGA'S PURCHASES

Omega issued its first purchase order for the Ultralife on June 24, 1986. (9/17/96 Tr. at 36–37; Exh. 115). The purchase order was issued "to cover Omega's four (4) months requirements" for the Ultralife. The "Delivery Schedule" called for deliveries of 5,136 units over a period of approximately four months beginning on October 2, 1986. (Exh. 115). Before any batteries were delivered however, Omega commenced "a major campaign" to promote the fact that it would be supplying, at no extra cost, Ultralife lithium batteries with each hand held instrument sold. (9/17/96 Tr. at 37). Kodak advised Omega that the Ultralife would not be available to Omega until March 1987. (9/12/96 Tr. at 130–31; 9/17/96 Tr. at 37; Exh. 26). In the interim period, Kodak supplied Omega with Supralife (alkaline) batteries, which were replaced with Ultralife batteries once they became available; when supplying instruments during this period, Omega provided customers with a postcard which explained the absence of the Ultralife and would entitle them to either a credit for the cost of one battery or two free Ultralife batteries when they became available. (9/17/96 Tr. at 38–39; Exhs. 126A, 130, 143).

Omega purchased all the batteries pursuant to the purchase orders. (Exhs. 115–24. *See also* Exh. 543). Omega ordered nearly 120,000 Ultralife batteries from 1987 through 1990.[7]

| Purchase Order | Date | Number of Units | Exhibit Number |
|---:|---|:---:|:---:|
| 60618352 | 6/24/86 | 5,136 | 115 |
| 70212220 | 1/30/87 | 6,552 | 117 & 521 |
| 70401001 | 3/30/87 | 11,600 | 119 |

6. *See also* Exhs. 27–30, 38–39, 41, 43–45, 56–57, 59–60, 70, 72–73, 76, 78–79, 84, 86, 90, 92, 94, 96–97, 99–101, 144, 147, 580, 617 (subsequent Kodak testing and memoranda on difficulties with U9VL).

7. Several purchase orders covering the alkaline Supralife battery are not included in this table. In addition, the last purchase order, covering 200,000 batteries, is not included and is discussed more fully in Section I.H *infra*. The parties utilized different estimates for the numbers of batteries purchased. Precision is not required in light of the Court's Conclusions of Law, as set forth in Section II *infra*.

Cite as 30 F.Supp.2d 226 (D.Conn. 1998)

| Purchase Order | Date | Number of Units | Exhibit Number |
|---|---|---|---|
| 70624362 | 6/30/87 | 6,552 | 120 |
| 71026374 | 10/28/87 | 26,800 | 121 |
| 80414232 | 4/14/88 | 20,800 | 122 |
| 90404054 | 4/4/89 | 20,800 | 123 |
| 91103092 | 1/3/89 | 20,800 | 124 |
| Totals | | 119,040 | |

Omega's material control manager, Scott Wakeman, agreed that Omega "wanted to keep [its] options open to be able to buy other batteries if [it] didn't want to continue to buy [the Ultralife]." (9/17/96 Tr. at 127). Linney, Omega's former vice president of instruments and controls, testified: "If I was going to make this a long term contract or relationship, it would be [in the form of] a sales agreement.... I would have made dates. It runs from here to here. I wouldn't say a long term relationship—Hollander would have me out the door in a minute." (Exh. 741, at 261). Consistent with that stance, Kodak's Dickinson testified he never had any intention to enter into any type of contractual or long term arrangement beyond the purchase orders. (9/12/96 Tr. at 168). Because there was no contractual long term relationship provided for by the parties, Omega undertook a certain amount of risk with respect to incorporation of the Ultralife into its products and promotional literature.

By offering the Ultralife batteries in its own products, Omega wanted to leverage the Kodak brand name because Kodak had a reputation for high-quality, cutting edge technology. (9/25/96 Tr. at 141). It did so by featuring Kodak's Ultralife batteries in Omega's own promotional literature, including its handbooks, ads and postcard packs; this was the first time Omega had displayed the brand name of another company. (9/25/96 Tr. at 140; Exhs. 127–31). Omega's handbooks are multivolume sets of hardbound books that are both promotional and technically informative to end users. (9/25/96 Tr. 142–43; Exhs. 127–29). There was testimony to the effect that the handbooks have a useful sales life of approximately five years, with new sets being produced every few years. (9/17/96 Tr. at 64–65; 9/25/96 Tr. at 142. See also Exhs. 647, 652) Beginning in 1989, Kodak gave Omega a five percent discount as an incentive to Omega to advertise the Ultralife batteries. (9/11/96 Tr. at 203–04). Kodak was certainly aware that Omega was utilizing the Ultralife and the Kodak image in Omega's promotional literature. (9/11/96 Tr. at 204; Exh. 37).

## G. BLACK & DECKER'S PROBLEMS WITH ULTRALIFE BATTERY & EFFECT UPON OMEGA

In late 1987, another OEM customer for the U9VL, Black & Decker, raised technical questions related to deficient battery performance. (Exhs. 45 & 50).[8] In early 1988, Moxley met with representatives of Black & Decker in order to discuss the problems that the Ultralife was apparently causing to Black & Decker's new flashlight program. (9/9/96 Tr. at 146–47). In a press release dated February 19, 1988, Kodak revealed that the Ultralife had a "storage-life deficiency" which "does not affect the use life of the 9–volt lithium cells in the vast majority of popular uses." (Exh. 147, at 1; see also Exh. 146). The shortened storage life was "caused by an unexpected buildup of internal resistance in the batteries when stored unused over a period of time. It is not related to the energy capacity of the batteries." (Exh. 147, at 1). Kodak initially agreed to a recall of all its Ultralife batteries supplied to Black & Decker and eventually reached a settlement of all potential claims Black & Decker had

---

**8.** Moxley testified that it was Kodak that brought the shelf life problem to the attention of the people at Black & Decker, rather than the other way around. (9/9/96 Tr. at 146; 9/10/96 Tr. at 34–35; Exhs. 149 & 754).

with respect to the technical issues it raised. (9/9/96 Tr. at 147–49). The settlement agreement called for a payment of $5.9 million and the return to Kodak of all batteries and further specifically provided that nothing in the settlement agreement shall "constitute any admission of fault or liability by [Kodak]." (Exh. 71; *see also* Exhs. 50, 61–62, 66, 146–47, 149, 199, 754).

The Black & Decker situation received attention in the *Wall Street Journal* in an article dated February 22, 1988. (Exh. 51). On that day, after reading this article, Wakeman contacted Dickinson for an explanation. (9/12/96 Tr. at 39–40, 159; 9/17/96 Tr. at 53; Exh. 55; Exh. 599, at Bates # K000315). According to Wakeman, Dickinson left him with the impression that the battery would still meet the "original" specifications, including the ten-year shelf life, for the specific applications to which Omega was putting the Ultralife. (9/17/96 Tr. at 53). Further, Wakeman claimed Dickinson said that within six to eight weeks Kodak would remedy the situation with respect to the ten-year shelf life specification for *all* applications, including the very high drain and very low drain applications. (9/17/96 Tr. at 55)(emphasis added); (Exhs. 561–62). He testified that Dickinson never said that the battery had less than a ten-year shelf life. (9/17/96 Tr. at 57).

Dickinson, on the other hand, testified that Wakeman and Omega knew Kodak was withdrawing the ten-year shelf life claim, but that because it did not affect their low-to-medium drain applications, Omega would continue to purchase the Ultralife despite knowing the ten-year shelf life claim was withdrawn. (9/12/96 Tr. at 160). To support this contention, Kodak introduced three exhibits: (1) a letter, dated February 22, 1988, from Dickinson to Wakeman with attachment stating that "the long term shelf life of our 9–volt lithium battery was less than predicted for a number of applications." (Exh. 55, at 2); (2)

contemporaneous notes of Dickinson regarding the phone call on February 22, 1988, indicating that Omega "will plan to go with current product." (Exh. 599, at Bates # K000315); and (3) a memo, also dated February 22, 1988, from Wakeman to the Hollanders stating that "the 9V Lithium battery which was supposed to have a 10 year shelf life does not." (Exh. 561). In addition, commencing in April 1988, Kodak changed certain product data sheets sent to OEM's to reflect a four-year shelf life and Dickinson testified credibly that he regularly dropped off data sheets and brochures whenever he visited OEM's (*i.e.*, including those reflecting five year shelf life claims). (9/12/96 at 37–39, 57). Indeed, at no time after the Black & Decker incident did Kodak make a ten-year shelf life claim in its publicly available literature. (9/10/96 Tr. at 26; Exh. 56).[9] The Court finds that Omega was informed of the withdrawal of the ten-year shelf life claims at least as early as February 1988.

In any event, in early 1988, Kodak became aware that the ten-year shelf life claim was not accurate and that it could "no longer substantiate the fact that we had shelf life of ten years in all applications," as Moxley conceded. (9/9/96 Tr. at 127). This was due to the fact that the accelerated testing used to support the shelf life claims was incapable of predicting the internal resistance phenomenon discovered in "real-life behavior in storage conditions." (Exh. 147, at 1). In other words, the standard methodologies and techniques for predicting shelf life could not reliably predict the actual performance characteristics of the Ultralife in storage. Moxley and Adams agreed that OEM's would be contacted and informed of the "new test data" so long as "it was applicable to the applications for which they were buying the product" (*i.e.*, certain high drain rate applications). (9/9/96 Tr. at 136–38). Kodak determined that Omega was not affected, and therefore it did not inform it of the recent changes.[10]

---

**9.** At some point in time, Kodak utilized a more stringent criteria for measuring shelf life that permitted only a ten percent loss of capacity rather than the twenty percent. (9/10/96 Tr. at 28; Exh. 84).

**10.** Omega argues that the definition of shelf life could not be what Kodak contends it is if the reference to specific applications is accurate. In other words, Omega claims that shelf life must include intermittent use because Kodak informed Omega that shelf life claims were not affected *for*

In a handwritten note from Adams, dated December 4, 1987, Moxley was informed that "Paul is under tremendous pressure as a result of our lack of understanding of the affects of aging of U9VL. We've just opened up availability of product to him but now it's questionable whether we should be selling OEM's and building future disasters for us." (Exh. 46; 9/9/96 Tr. at 139–41). Moxley later understood that the comment reflected Adams' frustration about the technical issue and that it was his way of putting some pressure on them to resolve it. (9/9/96 Tr. at 142). Therefore, the statement should not be taken as anything more than hyperbole, and does not constitute an "admission" that the Ultralife could not live up to performance expectations in the Omega applications at issue in this case.

## H. KODAK'S EXIT FROM ULTRAL-IFE BUSINESS & FINAL NEGOTI-ATIONS WITH OMEGA

By the end of 1989, Kodak had reached a decision to stop heavily investing in the battery business. (9/9/96 Tr. at 41–42; 9/19/96 Tr. at 11, 16–17. See also Exhs. 104, 107, 111, 113–14, 159, 166, 169, 180, 200). By March 1990, Kodak came to the conclusion that it could no longer afford to financially support the manufacture of lithium batteries and Kodak moved "toward a downsizing exit strategy by the end of the year." (9/19/96 Tr. at 26). This investment decision was made under pressure from outside financial analysts and the Kodak CEO who determined that the product line of batteries was not "inside the circle of core competencies" for the cash-poor company. (9/9/96 Tr. at 41–42). At the same time, Ultra Technologies, which had been a separate division

within the photo products group, became a part of the consumer products division, itself a division of the photo products group. (9/9/96 Tr. at 46–48. See also Exhs. 196, 677, 682, 745–46). This effectively inserted an additional layer of management into the battery business and perhaps signaled the eventual exit from the business. (9/9/96 Tr. at 48–49).[11]

Kodak notified Omega that it would discontinue manufacture of the U9VL effective April 5, 1990; in a letter to Rick Frank, Omega's purchasing agent (9/20/96 Tr. at 178), Clark indicated that the exit from the business was due to unacceptable economic performance and "[c]ontinued efforts to correct this situation are just not consistent with [Kodak's] financial objectives." (Exh. 181). Further, Clark stated: "Limited quantities of batteries are available and will be used to fill existing orders until supplies are exhausted. Any new orders will be accepted on a backordered basis only, with no guarantee of delivery." (Id.). Omega expressed surprise and concern at Kodak's decision to exit the lithium battery business. (9/20/96 Tr. at 191–92). On April 9, 1990, Frank called Clark to express displeasure at Kodak's exit from the battery business and to tell Clark that Omega definitely wanted Kodak to fill the open order for 10,400 units. (9/27/96 Tr. at 66–67; Exhs. 636 & 124).

On April 11, 1990, Charles Mangarella, who was in charge of material and production control for Omega (9/24/96 Tr. at 88), called Clark and informed him that Omega would need 200,000 units and "threatened" the use of lawyers if an accommodation could not be worked out. (9/27/96 Tr. at 71–73; Exh. 636, 647, 652, 662).[12] On April 20, 1990, Omega

---

*their applications.* However, it is possible that the internal impedance problem disclosed by Kodak could manifest itself in OEM products in which the battery was incorporated but not yet put into use (*i.e.*, with the battery installed in the product which sits in inventory). This is consistent with the Court's definition of shelf life.

11. There was a great deal of testimony regarding Kodak's initial attempt to exit from the entire battery business and the eventual exit from the lithium battery business only. (*See* 9/10/96 Tr. at 2–8, 10–19). Ultimately, the reasons for selling

the lithium business alone related to its particular unprofitability, poor manufacturing yields, and failure to meet financial targets.

12. Around this same time, Omega pursued the option of purchasing the Ultralife lithium battery business to ensure the steady supply of the U9VL. (9/25/96 Tr. at 153–54). This option did not come to fruition, as Dr. Hollander was unimpressed with the manufacturing process and did not think it would be right for Omega. (9/25/96 Tr. at 156; Exhs. 554, 669).

issued Purchase Order No. 00416214 calling for 200,000 batteries to be delivered over the course of the next four years on a monthly basis at a cost of $2.09. (Exhs. 124 & 184). Omega and other OEM customers convinced Kodak to continue production of the 9 volt lithium batteries, but Kodak management decided that it would not continue to produce batteries at the prices previously offered. (9/19/96 Tr. at 27–28). Rather, it decided to offer continued production as an accommodation at the "break even" price of at least $4.59. (9/19/96 Tr. at 28; 9/27/96 Tr. at 84–85; Exh. 667).

In early May 1990, Frank discussed the possibility of a price increase with Clark; Frank informed him that Omega "would strongly be opposed to any price increase for a minimum of two years." (Exh. 531). This opposition was consistent with Omega's position that sales of product advertising the Ultralife would continue from the hardbound catalogues for a minimum of two years. (Id.). On June 15, 1990, Clark acknowledged Omega's latest purchase order for 200,000 batteries, indicating shipment of 4,000 units scheduled for June 5, 1990 and another 4,000 units on July 15, 1990 at a price of $4.59. (Exh. 515. See also Exh. 678). On two subsequent occasions, batteries were shipped to Omega.[13] On June 21, 1990, Frank wrote an internal memorandum regarding Clark's acknowledgment, indicating awareness of the new invoice price and advising that he thought "we should have our strategy in order before we respond." (Exh. 698. See also Exh. 693).

On July 6, 1990, Dr. Hollander wrote to Adams regarding the price increase to $4.59 and insinuated that the price increase was "another way of saying the battery is not available." (Exh. 570). On August 21, 1990, Frank wrote to Kodak's supervisor of accounts payable regarding two invoices, dated 7/9/90 and 8/13/90, under which the 8,000

batteries were shipped. (Exh. 703). Omega claimed to be "shocked to see [Kodak] had invoiced [Omega] more than twice ($4.59 vs. $2.09) the current agreed upon purchase order price for these batteries." (Id. at 1). Further, Frank wrote: "We have absolutely no intention of paying this exorbitant price of $4.59 for these batteries and are prepared to return the balance of this inventory if we can not agree on a price." (Id.). In its Reply to Kodak's Counterclaim, filed November 6, 1991, Omega admitted that it had not returned the batteries purchased on the last purchase order. (Dkt. # 50, at 1–3). Although Frank admitted to receiving batteries on the new purchase order, he could not answer definitively whether Omega had paid nothing or $2.09 or $4.59, because "invoices [went] directly to the accounts payable department" and Frank, as purchasing manager, did not see them. (9/20/96 Tr. at 198–99, 200–01).

## I. FURTHER TESTING OF BATTERIES

On July 31, 1990 and again in October 1990, an engineer at Omega conducted tests of the Ultralife in an Omega product called the OMEGASEZ, product number HHM1. (9/25/96 Tr. at 46–51). In these two tests, the Kodak batteries performed much better than the alkaline batteries against which they were tested. (Id. at 47). On November 2, 1990, Omega filed its original complaint in the instant action.

On three subsequent occasions, Francis Jobaggy, Omega's manager of product development (9/25/96 Tr. at 7–8), tested selected batches of the approximately 17,000 batteries that were stored at Omega. (Id. at 11). On September 12, 1991, Jobaggy tested 1,000 batteries, measuring "open circuit voltage" as against the battery specification number 2.1 calling for open circuit voltage of between nine and ten volts. (Id. at 17–18; Exhs. 6 & 132). Jobaggy testified that 297 of the 1,000

---

**13.** The exhibits indicate that, as of the April 1990 announcement to exit the battery business, there were outstanding deliveries scheduled on Purchase Order No. 91103092 at the "old" price of $2.09. (See Exh. 124 and handwritten notes thereon). Although there is no paper trail re-

garding whether the old purchase orders were filled at the $2.09 price, Frank agreed that the prior purchase orders were eventually filled and "some batteries were delivered that were only under the new [purchase order for 200,000 units]." (9/20/96 Tr. at 198).

batteries tested were "way below nine volts." (9/25/96 Tr. at 18–19). Jobaggy also visually inspected the 1,000 batteries and noted evidence of leakage in two instances. (*Id.* at 58–60; Exh. 132, at Bates è51–62). On September 30, 1991, Jobaggy took a different batch of 400 batteries and tested them for internal resistance as against the Kodak specification 2.2 calling for "internal resistance of a fresh battery shall be at 68 degrees Fahrenheit, six ohms maximum." (9/25/96 Tr. at 22–24). Of the 400 batteries tested for internal resistance, Jobaggy testified that 397 failed to meet the specification in that they were greater than six ohms resistance and therefore "were not able to deliver the power that was inherent in the battery." (*Id.* at 25). Finally, sometime in the May to July 1992 time period, Jobaggy tested additional batteries, this time to determine "the ability of the battery to deliver current over a period of time" and at different load conditions. (*Id.* at 26–29). Under light load conditions of 300 ohms, twelve of twelve batteries delivered the "expected life expectancy of 41 hours." (*Id.* at 28). At 180 ohms, twelve of fifteen passed; at the higher loads of ninety and thirty-six ohms, all the thirty-six batteries tested "failed." (*Id.* at 29).

Omega was not alone in conducting battery tests after the litigation was filed. In rather dramatic courtroom testimony, Clark, the inventor of the Ultralife, explained how he had conducted tests on battery samples he had retained after retiring from Kodak. In one instance, just before the original trial date in December 1995, a battery contained in the original packaging from the product announcement in May 1986 was found to produce a voltage reading of 9.6 volts. (9/27/96 Tr. at 93–94; Exh. 738). In another instance shortly before this trial, Clark again tested another Ultralife battery from the May 1986 product announcement kit and found it produced a 9.6 volt reading. (9/27/96 Tr. at 95–97, 98–100; Exh. 751). One of these batteries also powered an AM–FM portable radio. (*Id.* at 99–100). A third battery which was manufactured in January 1990 was tested by Clark as against the Discharge Curves contained in the First OEM Brochure (Exh. 15, at 3). In this test, the six and one-half year old battery powered a portable radio for at least 47 hours, "provid[ing] not only the derated life [accounting for the age of the battery], but more than the initial full rated life of a new battery, and it was still performing at the time [Clark] discontinued the test." (9/27/96 Tr. at 100, 101–02). On cross-examination, Clark admitted that by these tests he was not trying to prove that all the Ultralife batteries had a ten-year shelf life. (*Id.* at 134–36). Rather, Clark was merely showing that "it was possible to make a battery that had a ten-year shelf life." (*Id.* at 136).

## II. CONCLUSIONS OF LAW

The following constitutes the Court's conclusions of law pursuant to FED. R. CIV. P. 52(a):

### A. PROMISSORY ESTOPPEL

■ In Count Three of its Third Amended Complaint, Omega alleges that "[f]rom 1986 through the early months of 1990, Kodak made express and numerous representations both in writing and orally that it would supply Omega's 9–volt lithium battery requirements for an extended period of time." (Dkt. # 246, ¶ 45). Omega further alleges that it invested time and money in connection with Kodak's representations, and it has suffered substantial damages under the theory of promissory estoppel. (*Id.* ¶¶ 46–48). Significantly, Omega did not submit arguments of law or findings of fact with respect to the claim for promissory estoppel in its post-trial briefs. (*See* Dkt. ## 333–34).

Kodak contends that "[n]one of the statements or communications Kodak made to Omega constituted the type of clear and definite promise on which it would have been reasonable for Omega to rely. Both parties intended their relationship to be governed by the purchase orders and not by their letters of statements." (Dkt. # 337, at 11, ¶¶ 4–5). The Court agrees.

■ "In Connecticut, an implied employment contract may arise under the doctrine of promissory estoppel, where injustice

to a promisee who has acted in reliance can be avoided only by enforcement of 'a clear and definite promise which a promisor could reasonably have expected to induce reliance.'" *Manning v. Cigna Corp.*, 807 F.Supp. 889, 895 (D.Conn.1991)(*quoting D'Ulisse–Cupo v. Board of Directors of Notre Dame High School*, 202 Conn. 206, 213, 520 A.2d 217 (1987); *Eadie v. McMahon*, No. 5:91 CV 423(WWE), 1997 WL 289679, at *11 (D.Conn. Mar. 12, 1997)(same)). The determination of whether certain statements were promissory, whether a contract was created, and what the parties intended to encompass in their contract are questions for the trier of fact. *Coelho v. Posi–Seal Int'l., Inc.*, 208 Conn. 106, 113, 544 A.2d 170 (1988); *Torosyan v. Boehringer Ingelheim Pharm., Inc.*, 234 Conn. 1, 17 n. 6, 662 A.2d 89 (1995); *see also Manning*, 807 F.Supp. at 895.

Neither Kodak nor Omega intended that Kodak would be bound to provide Ultralife batteries for a given term or at a given price other than that set forth in the purchase orders, or to create a reliance interest by Omega on Kodak providing batteries on a long term basis. As set forth in Section I.F *supra*, Wakeman testified that Omega "wanted to keep [its] options open to be able to buy other batteries if [it] didn't want to continue to buy [the Ultralife]." (9/17/96 Tr. at 127). And Linney testified that if he had entered into a long term relationship with Kodak for the Ultralife, "Hollander would have me out the door in a minute." (Exh. 741, at 261). This indicates that any actions taken by Omega with respect to advertising or product development were undertaken at Omega's own risk and regardless of Kodak's long term plans to remain in the business.

Furthermore, while Kodak officials had expressed an aspiration for such long range plans in the battery business, their statements were not so clear as to encourage reliance by Omega. For example, Wakeman testified that he "had discussed Kodak's entry into the battery business, which was a departure for them, and [Dickinson] told us that they had invested millions of dollars in developing these products, and that they had built a factory and that they were in it for the long haul." (9/17/96 Tr. at 66). The Court finds that Kodak's statements were not statements of a clear and definite promise sufficient to support a claim for promissory estoppel. In addition, the evidence presented indicated that Omega was not induced to rely on any long term commitments by Kodak to supply Omega's Ultralife requirements indefinitely. The evidence was quite the contrary.

■ Moreover, each purchase order contained the following language: "Entire Agreement. This purchase order and the documents referred to on the face hereof constitute the entire agreement between the parties." (9/17/96 Tr. 32–35; Exhs. 115–24, 521). Given that the parties intended the purchase orders to control their contractual relationship, the Court would be hard pressed to overturn that clear expression even if Omega had presented sufficient evidence of a clear and definite promise. "[A] promisor is not liable to a promisee who has relied on a promise if, judged by an objective standard, he had no reason to expect any reliance at all." *D'Ulisse–Cupo*, 202 Conn. at 213, 520 A.2d 217 (citation omitted).[14]

**14.** The Court holds that Kodak did not make a clear and definite promise which it could have expected to induce reliance on the part of Omega. However, even if Kodak did make a promise to "supply Omega's 9–volt lithium battery requirements for an extended period of time" (Dkt. # 246, ¶ 45), the claim for promissory estoppel would fail. That is because, if Kodak promised to supply the lithium batteries for the long run, that promise was necessarily either true or false at the time it was made. If it were false, then the claim is properly addressed under Count Six for fraud or Count Seven for negligent misrepresen-

tation. *See* Sections II.C & II.D *infra*. But if it were true at the time it was made, Omega's claim for promissory estoppel would still fail because Omega proved no damages by virtue of Kodak's exit from the battery business. A claim for promissory estoppel will only lie if "injustice can be avoided only by enforcement of the promise." *D'Ulisse–Cupo*, 202 Conn. at 213, 520 A.2d 217 (citation omitted). There was simply no evidence presented which would show that Kodak's "withdrawal damaged Omega's reputation with ... customers who did not yet possess the battery but wanted to." *Omega*, 908 F.Supp. at 1094, n. 6.

## B. BREACH OF WARRANTIES

Count Four of Omega's Third Amended Complaint is entitled "Breach of Warranty Shelf Life" and Count Five is entitled "Breach of Warranty Leakage." In the parties' post-trial submissions, these claims have evolved into separate claims for breach of express warranty, breach of implied warranty of merchantability and breach of warranty of fitness for a particular purpose. The Court will address these claims in the same manner as the parties' post-trial submissions.

### 1. BREACH OF EXPRESS WARRANTIES

In Count Four of its Third Amended Complaint, Omega contends that Kodak expressly warranted a ten-year shelf life for the Ultralife battery, but that the batteries actually purchased had a "practical shelf life [of] no more than two years and cannot be furnished by Omega as an original power source with its instruments if the battery is more than two years old." (Dkt.# 246, ¶¶ 50, 52, 55). Omega further contends that "[t]he Ultralife batteries purchased from Kodak failed to conform to the express warranties made by Kodak." (Id. ¶ 56). In Count Five, Omega claims that the "electrolyte inserted within the casing of the batteries has leaked either externally or internally or both rendering the batteries useless." (Id. ¶ 61). In two cases, Omega alleged that the leaking electrolyte damaged Omega's products and that Omega replaced the units at a total cost of $1,400. (Id. ¶ 62). Omega further alleges that "[a]s a result of the defect in the Ultralife battery which causes leakage of the lithium [sic], the Ultralife batteries purchased from Kodak fail to conform to the express warranties made by Kodak." (Id. ¶ 64). Omega contends that it seasonably notified Kodak of its breach of warranty. (Id. ¶ 66). In its post-trial submission, Omega claimed that Kodak created express warranties with respect to three battery attributes: (1) shelf life; (2) impermeability; and (3) that the U9VL was perfect for use in long-term intermittent rest applications. (Dkt. # 334, at 42).

In its answer, Kodak denies that any product material furnished to Omega constituted "express warranties," denies that at any time after February 1988 that Dickinson claimed a ten-year shelf life, and denies that Dickinson "assured Omega that the ten-year shelf life was true with respect to Omega products" as of February 22, 1988, or at any time thereafter. (Dkt.# 247, ¶¶ 50, 52). In addition, Kodak claims that its

> statements about the shelf life of the Ultralife batteries and other technical characteristics were reasonable engineering projections and descriptions, but were not fully definite to constitute express representations of quality or performance.
>
> Even if Kodak's representations were definite enough to create express warranties, Omega has not established that any such warranty was breached. There is no evidence that any specific Ultralife battery delivered to Omega failed to conform with such warranties.

(Dkt. # 337, at 13, ¶¶ 12–13). Finally, Kodak argues that "Omega did not prove that it suffered any direct damages caused by Kodak's representations" as to shelf life or impermeability, and that even if it had, Omega's damages "would be limited to its cost for a replacement battery or, at most, the instrument the non-conforming battery damaged if it could be shown that the battery caused the damage." (Dkt. # 336, at 64, 65).[15]

---

15. Kodak's warranty, as repeated on Omega's Purchase Orders, provided: "Any device damaged by this power cell will be repaired or replaced (at our option) if sent with the power cell(s) to the address below. Guarantee void if power cell is recharged. Eastman Kodak Company c/o Ultra Technologies, P.O. Box 267, Newark, N.Y. 14513." (See Exhs. 115 & 120). There is no evidence that any devices allegedly damaged were tendered to Kodak under the terms of that provision. However, the Purchase Orders contained the following language:

> Warranty. Seller expressly warrants that all goods ... furnished under this agreement shall conform to all specifications and appropriate standards, will be new, and will be free from defects in material or workmanship.... Seller warrants that all such goods ... will conform to any statements made on the containers, labels or advertisements .... Seller warrants that all goods ... furnished hereunder will be merchantable and will be safe and appropriate for the purpose for which the goods ... of that kind are normally used.

(9/17/96 Tr. at 32–35; Exhs. 115–24, 521).

The elements for a claim for breach of warranty are: (1) existence of the warranty; (2) breach of the warranty; and, (3) damages proximately caused by the breach. CONN. GEN. STAT. § 42a–2–314, cmt. 13; *Acme Pump Co., Inc. v. National Cash Register Co.*, 32 Conn.Supp. 69, 71–72, 337 A.2d 672 (Com.Pl.Ct.1974); *see also* Dkt. # 334, at 40 & Dkt. # 336, at 11, ¶ 6. Any affirmation of fact or promise made by the seller of goods to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise. CONN. GEN STAT. § 42a–2–313(1)(a); *Moldex, Inc. v. Ogden Eng'g Corp.*, 652 F.Supp. 584, 589 (D.Conn.1987). "A description need not be by words. Technical specifications, blueprints and the like can afford more exact description than mere language and if made part of the basis of the bargain goods must conform with them." CONN. GEN STAT. § 42a–2–313, Comment 5. Buyers bear the burden of proving the existence of an express warranty. *Vezina v. Nautilus Pools, Inc.*, 27 Conn.App. 810, 816, 610 A.2d 1312 (App.Ct.1992). While advertisements can be part of the basis of the bargain, the plaintiff must show, at a minimum that he or his agent knew of and relied on the statement. 1 J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE § 9–5, at 494–95 (1995) ["WHITE & SUMMERS"].

The threshold issue is to identify what statements, if any, constituted an express warranty by Kodak. Clearly, the shelf life specifications promulgated by Kodak could constitute an express warranty with respect to the characteristics listed, provided, however, that the parties made such specification a basis of the bargain. As stated in Section I.F *supra*, Omega committed to purchase the batteries before receiving the product literature or any samples; therefore, the early written materials sent to Omega cannot be said to form the basis of the bargain. In addition, there was credible evidence to conclude that shelf life was not the most important attribute that attracted Omega to the Kodak battery. In that regard, if any battery attribute could be said to serve as the "basis of the bargain," the parties understood it to be service life, which appears to be a valid claim for the Ultralife and one attribute upon which Omega does not continue to make a claim. (*See* Complaint, filed Nov. 2, 1990 (Dkt.# 1), Count IV, ¶¶ 40–48).

In addition, there is an issue as to which of the several specifications provided to Omega were "in effect" at the time batteries were ordered. The evidence was that the specifications changed over time. There was conflicting testimony regarding whether Omega had received the revised specification with lowered performance expectations and whether Kodak sufficiently highlighted any significant changes to Omega. (*Compare* Exh. 6 (dated 3/19/86), Exh. 196, at Tab 24 (dated 10/24/88 with revisions on 1/11/89, 5/2/89, 6/21/89 and 9/18/89), *with* Exh. 64 (dated effective 6/1/88)). While Omega claimed they never received the later specifications, Dickinson testified he had a habit of dropping them off at each visit, a claim supported by contemporaneous notes. In Section I.G *supra*, the Court found that Omega was informed of the revised shelf life claims at least as early as February 1988. Therefore, Omega cannot claim the existence of an express warranty for ten-year shelf life for any batteries delivered at any time after that.

In any event, once any warranty language is established, a plaintiff must prove that such warranty was breached. In this case, Omega presented no reliable evidence of any defective batteries. The two Omega products referenced in Count Five (which supposedly leaked electrolyte and which Omega allegedly replaced at a cost of $1,400) were not offered into evidence. Omega offered one allegedly damaged instrument at trial (Exh. 214), but could not eliminate the possibility of customer misuse or state with sufficient certainty the circumstances under which that battery appears to have failed. (9/27/96 Tr. at 219–24).

As to the batteries that Jobaggy tested from the inventory in 1991, ultimately, the Court is confronted with an incomplete,

slightly unorthodox testing of batteries by a non-expert after the litigation had been filed.[16] No defective batteries were offered as evidence. No expert testimony was offered with respect to particular batteries that Omega felt were defective.[17] The tests were conducted against the original specification and not the updated specifications in effect for the batch of batteries tested. The results of the test were analyzed by Jobaggy incorrectly.[18] The batteries were tested against drain rates that were atypical for Omega applications. In sum, as a matter of proof, the Jobaggy tests were insufficient to prove damages for breach of warranty for shelf life claims.[19]

 The remaining statements claiming "impermeability" and that the batteries were "perfect for long term intermittent rest applications" are too general to create an express warranty.

The Uniform Commercial Code recognizes that some statements of sellers are merely "puffing" and do not create express warranties. Section 42a-2-313(2), for example, provides that "an affirmation merely of the value of goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." Drawing the line between puffing and the creation of a warranty is often difficult, but several factors have been identified as helpful in making that determination. One such factor is the specificity of the statement made. A statement such as "this truck will give not less than 15.1 miles to the gallon when it is driven at a steady 60 miles per hour" is more likely to be found to create an express warranty than a statement such as "this is a top-notch car." Statements to the effect that a truck was in "good condition" and that the motor was in "perfect running order" have been held not to create express warranties. Another factor to be considered in determining whether a statement creates an express warranty is whether it was written or oral, the latter being more likely to be considered puffing.

*Web Press Services Corp. v. New London Motors, Inc.,* 203 Conn. 342, 351–52, 525 A.2d 57 (1987) (citations omitted). While several of the statements regarding impermeability were in writing, many were not. In addition, some of the statements were tempered with

16. Omega admitted in its Answer to the Counterclaim that many of the batteries in inventory were not paid for. (Dkt. #50, at 1–3). A requirement of any breach of warranty claim is that there be an actual sale of goods. In light of Kodak's claim of non-payment, absent proof of payment, Omega ordinarily would be precluded from bringing a breach of warranty claim. However, because the Court finds for Kodak on its Counterclaim, *see* Section II.G *infra*, the holding with respect to the three breach of warranty claims is not made with respect to the non-sale issue.

17. The Court ruled on defense counsel's objections on expert and business records grounds with respect to Exh. 132 as follows: "... the necessary foundation has been laid with respect to a business record. To the extent that this business record was generated after the litigation was commenced, that obviously goes to the weight of the document. With respect to whether or not the witness testifies as an expert, obviously we will take that question by question." (9/25/96 Tr. at 15–16). Plaintiff's counsel had sufficient opportunity to bolster the proof of defective batteries but did not choose to take advantage of that opportunity. Accordingly, the Court gives little weight to the testing done by Jobaggy.

18. For example, Jobaggy's analysis failed any battery with an open circuit voltage of less that 9 volts. (9/25/96 Tr. at 18–19). However, as plaintiff's battery expert testified, the shelf life claim permits a loss of up to twenty percent over time to still meet the specification. (9/17/96 Tr. at 168).

19. As then Chief Judge Dorsey mentioned in his ruling on summary judgment, incidental damages are available for a seller's breach of warranty. *Omega,* 908 F.Supp. at 1094. Incidental damages include "expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, and commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expenses incident to the delay or other breach." CONN. GEN. STAT. § 42a-2-715(1). Omega did not "rightfully reject" any goods and did not attempt to prove incidental damages otherwise attributable to alleged defects in the Ultralife. *See* Sections II.G & H *infra.*

language that would alert a prudent buyer to the possibility of puffing. For example, if a battery were literally impermeable, the seller would not admit to testing power cells for "minute leaking" or alternatively refer to the battery as "tightly sealed." (*See* Section I.D *supra*). Moreover, Omega presented no evidence that leaking batteries caused any damage to its products.

Similarly, statements that a product is "perfect" for a particular application amount to puffery under the circumstances of this case. First, a claim of "perfection" should be viewed skeptically as it is usually an abstract statement that a particular product meets an ideal standard, and is usually made by a sophisticated seller targeting an equally sophisticated buyer. Here, the claim of perfection is more akin to a claim that the Ultralife satisfies the requirements for a particular application. Second, and more fundamentally, there was no evidence that the Ultralife did not meet the requirements of "long term intermittent rest applications" such as being used in a digital volt ohm meter. Third, under the circumstances of this case, the statement is more akin to a mere "opinion or commendation of the goods" so as not to create a warranty. *Web Press*, 203 Conn. at 351–52, 525 A.2d 57. Finally, Omega presented no evidence that it was damaged in any way by the Ultralife's "failure" to live up to the statement that the battery was perfect for long term intermittent rest applications.

Omega failed to meet its burden of proof with respect to its claims for breach of express warranty. The statements relied upon by Omega were not of the type to create an express warranty for the various reasons set forth above and Omega failed to prove damages for breach of express warranty. To the extent Omega claims damages for defective batteries, customer returns, lost profits and lithium battery acquisition, the failure to meet its burden with respect to these types of damages is set forth in greater detail in Section II.H *infra*.

### 2. BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

 In Count Four, Omega contends generally that with respect to shelf life claims, the Ultralife batteries purchased from Kodak "fail to conform to the promises and affirmations of fact contained in Kodak's marketing brochures describing the product." (Dkt.# 246, ¶ 56). In addition, Omega contends that with respect to electrolyte leakage claims, the Ultralife batteries "fail to conform to the implied warranty of merchantability ... and fail to conform to the promises and affirmations of fact contained in Kodak's marketing brochures describing the product." (*Id.* ¶ 64). Omega contends that it seasonably notified Kodak of the breach of warranty. (*Id.* ¶ 66).

Kodak specifically denies Omega's allegations in the complaint with respect to breach of implied warranty of merchantability. (*See* Dkt. # 247, ¶¶ 49–67). In addition, Kodak argues that

> Omega has not shown that any Ultralife batteries delivered to it were not merchantable or fit for their ordinary purpose. On the contrary, the evidence is clear that the Ultralife batteries that were delivered to customers performed well, and there is no conflicting evidence except the tests performed by Jobaggy. There is insufficient evidence, however, that the batteries tested by Jobaggy were stored properly or that they were tested to appropriate standards.

(Dkt. # 337, at 14–15, ¶ 20).

 CONN. GEN. STAT. § 42a–2–314 sets forth the implied warranty of merchantability, which is implied in any sale of goods by a merchant seller. *Standard Structural Steel v. Bethlehem Steel Corp.*, 597 F.Supp. 164, 187 (D.Conn.1984). In contrast to the warranty of fitness for a particular purpose, the implied warranty of merchantability is the broadest and most important warranty in the Uniform Commercial Code. *Id.* (*citing Schenck v. Pelkey*, 176 Conn. 245, 253–54, 405 A.2d 665 (1978)).

To recover under this section, "a plaintiff must prove (1) that a merchant sold goods, (2) which were not 'merchantable' at the time of the sale, and (3) injury and damages to the plaintiff or his property, (4) [were] caused approximately and in fact by the defective nature of the goods, and (5)

[that] notice [was given] to the seller of the injury."

*Standard Structural Steel*, 597 F.Supp. at 187 (*quoting* WHITE & SUMMERS). "The implied warranty of merchantability holds merchants liable to the extent their goods fail to conform to the ordinary purpose for which they are supposed to be used." *Moldex*, 652 F.Supp. at 590.

Goods to be merchantable must be at least such as (a) pass without objection in the trade under the contract description; and (b) in the case of fungible goods, are of fair average quality within the description; and, (c) are fit for the ordinary purpose for which such goods are used; and (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and (e) are adequately contained, packaged, and labeled as the agreement may require; and, (f) conform to the promises or affirmations of fact made on the container or label if any.

CONN. GEN. STAT. § 42a–2–314(2).

Omega did not prove at trial that any Ultralife batteries delivered to it were not merchantable or fit for the ordinary purpose for which they were to be used. No defective batteries were introduced into evidence. No customers testified regarding defective batteries. The Black & Decker situation raised technical issues only with regard to particular Black & Decker products such as the high-drain flashlight program, which was very unlike the vast majority of applications in which Omega used the Ultralife. In addition, notwithstanding the large settlement amount, Kodak and Black & Decker specifically precluded any admission of liability or fault with respect to the Ultralife in their settlement agreement. To the extent battery storage life was affected in the months after the Black & Decker settlement, the evidence showed that Omega was aware of the reduced shelf life claims and continued to purchase the Ultralife anyway. Kodak reasonably determined, and thereafter communicated to Omega, that any newly discovered deficiencies would not affect Omega's applications.

In addition, as discussed in the section on express warranty, Section II.B.1 *supra*, and more fully in Section II.H *infra*, Omega failed to prove injury and damages caused by Kodak or the Ultralife battery. The failure to prove this element of the claim for breach of implied warranty of merchantability precludes recovery for this breach of implied warranty of merchantability.

### 3. BREACH OF IMPLIED WARRANTY FOR A PARTICULAR PURPOSE

■ In Counts Four and Five, Omega similarly contends that representations regarding impermeability and shelf life amounted to implied warranties. With respect to this claim, however, Omega contends that Kodak knew of Omega's particular purpose in selecting the Ultralife and therefore the batteries "are not fit for the manufacture intended by Omega and are defective." (Dkt. # 246, ¶¶ 56 & 64; Dkt. # 334, at 42–43).

Kodak's arguments against a breach of warranty claims as outlined above were also made with respect to this claim. Kodak argues that there is no dispute that "Omega intended to use the Ultralife batteries in instruments that placed a low to medium load on the batteries." (Dkt. # 337, at 15, ¶ 24). Kodak argues that "Omega's intended use was an ordinary purpose for which the batteries were customarily used; therefore the warranty of fitness for a particular purpose does not apply." (*Id.* at 15–16, ¶ 24). In addition, Kodak argues that "there [was] no evidence that the Ultralife batteries did not conform to the requirements of Omega's use" nor was there evidence of any battery failing to perform well in a low to medium drain application. (*Id.* at 16, ¶ 26).

■ To recover for breach of implied warranty of fitness for a particular purpose, plaintiff must prove: (1) that the seller knew of the buyer's particular purpose, (2) that the seller knew that the buyer was relying on the seller's skill to provide a product that would satisfy the particular purpose, and (3) that the buyer did in fact rely on that skill.

CONN. GEN. STAT. § 42a–2–315; *Blockhead, Inc. v. Plastic Forming Co.*, 402 F.Supp. 1017, 1024 (D.Conn.1975); *Catania v. Brown*, 4 Conn.Cir.Ct. 344, 345–46, 231 A.2d 668 (App.Div.1967). This warranty obligation incorporates the idea of the buyer's specific use which is peculiar to the nature of his business, as compared to the ordinary purpose for which goods are used and those uses which are customarily made of the goods in question. *Blockhead*, 402 F.Supp. at 1024–25; CONN. GEN. STAT. § 42a–2–315, cmt. 2. If the particular purpose for which goods are to be used coincides with their general functional use, implied warranty of fitness for a particular purpose merges with the implied warranty of merchantability. *Beech Aircraft Corp. v. Flexible Tubing Corp.*, 270 F.Supp. 548, 561–62 (D.Conn.1967).

Omega intended to use the Ultralife batteries in its various instruments, placing a variety of loads on the batteries, but mostly in low to medium drain applications. As such, the intended purpose for which Omega purchased the Ultralife was an ordinary purpose and therefore the warranty of fitness for a particular purpose does not apply. *Blockhead*, 402 F.Supp. at 1025; CONN. GEN. STAT. § 42a–2–315 (cmt.2). In addition, as with the two other claims for breach of warranty, Omega failed to prove injury and damages caused by Kodak or the Ultralife battery. The failure to prove this element of the claim similarly precludes recovery for any breach of implied warranty of fitness for a particular purpose.

## C. FRAUD

In Count Six of its Third Amended Complaint, Omega alleges that Kodak committed fraud. Omega's allegations are three-fold: (1) "Kodak misrepresented to Omega its plans to remain in the 9–volt lithium battery business and its intent to continue to meet the supply needs of Omega for an extended period of time;" [20] (2) "Kodak misrepresented to Omega the shelf life of the Ultralife;" and (3) "Kodak misrepresented to Omega the safety of the Ultralife." (¶¶ 70, 73, 74). In its post-trial brief, Omega also makes reference to Kodak's representations regarding problems with the electrolyte; specifically Omega contends that Kodak claimed the switch of electrolyte around the time of the "Black & Decker problem ... returned the battery to original specifications" and that the switch was done "to fine tune battery chemistry." (Dkt. # 334, at 25–26).

Kodak argues that it did not make any knowingly false statements in that all performance statements "were based upon reasonable information and were truthful when made." (Dkt. # 336, at 57). In addition, Kodak argues that any failure to keep Omega apprised is not actionable because Kodak had no duty to speak under the circumstances. (*Id.* at 58). Specifically, because the decline in shelf life was not judged by Kodak to affect Omega or the intended applications in which Omega used the Ultralife, no statements were necessary. With respect to Kodak's business plans and ultimate exit from the battery business, Kodak argues that it "had no obligation to share with Omega its business alternatives and assessments and ... it would have violated Kodak's policies to have done so." (*Id.* at 59). Kodak also argues that there is no evidence of an intent to deceive and, in fact, the evidence shows that each Kodak witness categorically denied any fraudulent intent. (*Id.* at 59–60). Finally, Kodak argues that "Omega did not show that it was specifically damaged because of any alleged misrepresentations, whether intentional or negligent." (*Id.* at 61).

To state a claim for fraud, the plaintiff must prove the following elements: (1) a false representation made as to a statement of fact; (2) the statement was untrue and known by the defendant to be untrue; (3) the

---

**20.** To the extent this claim is for fraud in connection with the alleged requirements contract, Judge Dorsey previously ruled that there was no requirements contract which satisfied the statute of frauds. *Omega*, 908 F.Supp. at 1090–91. Accordingly, the Court will only consider this claim to the extent Omega can show fraud in connection with Kodak's "plans to remain in the 9–volt lithium battery business."

statement was made to induce the plaintiff to act; and, (4) the plaintiff acted on the false representation to its detriment. *Billington v. Billington,* 220 Conn. 212, 217, 595 A.2d 1377 (1991); *Maturo v. Gerard,* 196 Conn. 584, 587, 494 A.2d 1199 (1985).

## 1. FRAUDULENT MISREPRESENTATIONS

▮ Omega points to six false statements which it alleges were made as statements of fact and which were known to be false: (1) engineering specifications containing a ten-year shelf life claim; (2) OEM Brochures containing a ten-year shelf life claim; (3) representations of Peter Clark regarding shelf life; (4) impermeability of the casing; (5) after the Black & Decker "problem," the new electrolyte returned the battery to its original specifications; and (6) the switch in electrolyte was done to "fine tune battery chemistry." (Dkt. # 334, at 25–26). With respect to the shelf life and impermeability claims, the Court holds that the Kodak witnesses all credibly testified that they believed the battery characteristic claims were true when they were made. In addition, the shelf life claims were based upon microcalorimetry and Arrhenius testing, both of which are generally acceptable methods in the relevant scientific community. Therefore, in judging the credibility of the testimony and the weight to be accorded it, the Court finds that the second element of a claim for fraud is lacking with respect to shelf life and permeability claims. *Miller v. Appleby,* 183 Conn. 51, 55, 438 A.2d 811 (1981). Each element of a claim of fraud must be proven by clear and convincing evidence. *Beech Aircraft,* 270 F.Supp. at 565; *Puro v. Henry,* 188 Conn. 301, 308, 449 A.2d 176 (1982); *Miller,* 183 Conn. at 55, 438 A.2d 811. The failure to prove any one of the essential elements precludes recovery. *Adamowicz v. Stevens,* 6 Conn.Cir. 112, 115, 267 A.2d 678 (App.Div.1969). Accordingly, the statements regarding shelf life and permeability will not support a claim for fraud.

▮ With respect to the statements about the switch to the TFS electrolyte to "fine tune" battery chemistry, the Court holds that such a statement is insufficiently definitive in nature so as to support a claim for fraud.[21] First, the statement could be interpreted in so many ways and is innocuous enough to preclude an action for fraud under these circumstances. The change in electrolyte was not a wholesale change in the battery's design so as to make the declaration of "fine-tuning" factually incorrect. Second, the statement was made around the same time that Kodak opined that TFS should not be significantly different than Lectro for Omega's meter applications. This statement was supported by credible testimony. *See* Section I.E. *supra.* Third, it is simply not true, based upon the evidence, that Kodak "knew the TFS electrolyte was substantially inferior." (Dkt. # 334, at 27). Therefore the claim of fraud is not supported by the statement regarding "fine tuning."

▮ The statement regarding the return of the battery to original specifications will not support a claim for fraud for two reasons. First, it was not shown to relate to the ten-year shelf life claims made during 1986 and 1987, as it was unclear whether the "operable" shelf life claim at the time was for five years. If it were, those claims were not shown to be untrue, as the vast majority of Omega's argument and testimony related to the ten-year shelf life claim. Second, there was insufficient evidence to prove that the ten-year shelf life claims were untrue. At best, Omega proved only that there was internal disagreement among Kodak representatives with respect to the advisability of continuing to make the claim. Therefore, the claim that Kodak committed fraud in connection with the statement that the battery would return to original specification fails.

21. A more extensive discussion of the switch from Lectro to TFS electrolyte is found in Section II.C.2 *infra.*

## 2. FRAUDULENT NON–DISCLOSURES

■■■■■■ Omega claims that Dickinson purposefully failed to disclose to Omega his knowledge that the Ultralife did not have a ten-year shelf life, that the TFS batteries were substantially inferior, that Omega was one of only two OEM's to receive the inferior TFS batteries, and that Kodak intended to exit the battery business. Omega further claims that Dickinson knew in advance that Omega planned to feature the Ultralife in the 1990 hardbound handbooks, and that the handbooks would be published at the same time Kodak intended to exit the battery business. Wakeman testified that if he had known of Kodak's business plans, he would not have spent the money to feature the Ultralife in Omega's 1990 handbooks. (9/17/96 Tr. at 63–66). Omega claims deception with respect to Kodak's intentions to withdraw from the battery business.

> It is, of course, true that, under certain circumstances, there may be as much fraud in a person's silence as in a false statement. Mere nondisclosure, however, does not ordinarily amount to fraud. It will arise from such a source only under exceptional circumstances. To constitute fraud on that ground, there must be a failure to disclose known facts and, in addition thereto, a request or an occasion or a circumstance which imposes a duty to speak. To be áctionable for fraud, the nondisclosure must be by a person intending or expecting thereby to cause a mistake by another to exist or to continue, in order to induce the latter to enter into or refrain from entering into a transaction.

*Egan v. Hudson Nut Products, Inc.*, 142 Conn. 344, 347–48, 114 A.2d 213 (1955)(multiple citations omitted).

■■■■■ As stated earlier, Kodak representatives testified credibly that they believed the ten-year shelf life claims to be true at the time they were made. In early 1988 when Kodak became aware of potential shelf life problems, Kodak changed the product information sheets suppled to its OEM customers. In addition, Dickinson informed Omega of the withdrawal of the ten-year shelf life claim. Therefore, the claim that Dickinson failed to disclose to Omega his knowledge that the Ultralife did not have a ten-year shelf life is factually incorrect and legally insufficient.

■■■■■ With respect to Kodak's use of TFS as an electrolyte, Omega did not prove by a preponderance of the evidence that the new electrolyte was substantially inferior, especially as it related to Omega's low and medium drain applications. In 1989, Omega changed electrolytes from Lectro to TFS largely due to a request from Kodak's internal environmental health and safety department that the use of hexaflouroarsenate be discontinued. (9/12/96 Tr. at 76). Battery characteristics were quite similar between Lectro and TFS versions of the Ultralife. (9/12/96 Tr. at 81). On September 15, 1989, Dickinson wrote to Wakeman: "We would expect that you will see no significant change in battery performance for your application. We are however enclosing four samples of the modified chemistry battery for your evaluation." (Exh. 100). Pursuant to a request from Frank at Omega, on September 27, 1989, Dickinson faxed Discharge Curves indicating "that there is little difference except at higher current drains." (Exh. 103).[22] Despite the information provided to Omega, it did not complain about the performance of TFS batteries at that time. Finally, Omega did not prove any damages related to the change in electrolyte. No TFS batteries were introduced into evidence for the purpose of comparison with the Lectro batteries. Dickinson testified that the new TFS batteries were sent to Omega and one other customer, Federal Express. (9/12/96 Tr. at 90–92; Exh. 205). Federal Express was not called upon to testify as to any problems with the Ultralife. No customers testified as to problems related to the changed electrolyte. Accordingly, Omega's claim for fraudulent

---

22. As Dickinson acknowledged, based upon a report prepared by Dr. L. Chow of Kodak, the TFS version had a shorter shelf life than the Lectro batteries, but there was no significant effect upon service life. (9/12/96 Tr. at 81–84, 92; Exh. 72).

non-disclosure related to the change in electrolyte fails for lack of proof.

■ Kodak's plan to exit from the battery business was confidential information which was not intended for public consumption until a definitive corporate decision was made and an orderly announcement could be arranged. (9/11/96 Tr. at 4–6, 31–32; Exh. 107). Kodak's policy was to disclose information regarding the sale or termination of a business in an even-handed manner so that the investment community had equal access to the information at the same time. (9/11/96 Tr. at 31–32). Perhaps Dickinson was aware of a corporate-level review of business operations and that Ultra Technologies was vulnerable in late 1989; however, it cannot be said that he had "knowledge" to any degree of certainty that a corporate decision had been made in late 1989.[23] By March 1990, Kodak decided to exit the lithium battery segment of the business. Wakeman testified that the preparation of the Omega handbooks commenced approximately eighteen to twenty months before its publication. (9/17/96 Tr. at 13). Thus, Omega had already begun its work on the 1990 handbooks well before Kodak reached its decision regarding the lithium battery business. Therefore, to the extent that Omega claims damages for the 1990 handbooks in connection with its claim for fraudulent non-disclosure, such a claim necessarily fails.

### D. NEGLIGENT MISREPRESENTATION

■ In Count Seven of the Third Amended Complaint, Omega alleges that Kodak "prematurely marketed the Ultralife and negligently prepared product descriptive materials and specifications for the Ultralife describing its performance characteristics and features without adequate premarket research and testing." (Dkt.# 246, ¶ 80). Omega agues that

[n]o tests supported its press conference statements, OEM Brochures, or engineer-

ing specifications. The electrolyte had been changed a mere month before the press conference and no tests had yet established its efficacy. Indeed late tests definitively established its failures. But Kodak went right on extolling its supposed virtues and Omega reasonably relied on Kodak's statements.

(Dkt. # 334, at 35).

■ Kodak argues that "Kodak's statements about the Ultralife, including those relating to shelf life and permeability, were based on scientific data. Kodak used reasonable care in designing the Ultralife, investigating its performance characteristics and capabilities, and in informing Omega about those topics." (Dkt. # 337, at 20, ¶ 45). Finally, Kodak argues that Omega failed to show that it was damaged in connection with any misrepresentation. (*Id.* at 20, ¶ 43).

One who, in the course of his business, profession or employment ... supplies false information for the guidance of others in their business transactions, is subject to liability for the pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Manning,* 807 F.Supp. at 897 (*citing D'Ulisse-Cupo,* 202 Conn. at 217–18, 520 A.2d 217 ("the Connecticut Supreme Court adopted the principles of § 552 of the Restatement (Second) of Torts")).

■ The threshold issue is whether Kodak supplied false information to Omega in the course of the sales transactions for the Ultralife. As stated in Sections I.C & E *supra,* Kodak supported its press conference statements, OEM Brochures and engineering specifications with generally acceptable scientific testing such as microcalorimetry and Arrhenius testing. In addition, information was derived from basic research and experience in the "two-thirds A" battery utilizing lithium chemistry. It was reasonable for Kodak to rely on these testing methods, and

---

**23.** Dickinson was not among the six recipients of Moxley's confidential memorandum (Exh. 107);

Moxley specifically requested that "[w]e will tell no one ... outside of the seven of us ..." (¶ 4).

the shelf life claims were reasonable at the time they were made.

> If the matter is one that requires investigation, the suppliers of information must exercise reasonable care and competence to ascertain the facts upon which the statement is based. He must exercise the competence reasonably expected of one in his business or professional position in drawing inferences from facts not stated in the information.

RESTATEMENT (SECOND) OF TORTS § 552, cmt. f. (1977). To prove a claim for negligent misrepresentation, a plaintiff must show that defendant failed to exercise reasonable care or competence in obtaining or communicating information. *Johnson v. Chesebrough–Pond's USA Co.,* 918 F.Supp. 543, 548 (D.Conn.), *aff'd mem.,* 104 F.3d 355, 1996 WL 734043 (2d Cir.1996); *D'Ulisse–Cupo,* 202 Conn. at 219–20, 520 A.2d 217. In addition, plaintiff must allege an injury that is the direct and proximate result of the alleged misconduct. *Johnson,* 918 F.Supp. at 548.

While it would have been the best of all worlds to conduct real life testing before disseminating information regarding shelf life, Dr. Owens, Omega's battery expert, agreed that it would not be "commercially reasonable to expect the manufacturer to wait ten-years to get the real time data before making a ten-year shelf life projection." (9/18/96 Tr. at 137). Such an approach would delay new technology from reaching the market for too long and would be unrealistic, as Kodak pointed out. (Dkt. # 336, at 11). The business managers such as Moxley and Dickinson relied upon the technical experts such as Clark and the research labs technicians before making information available to Omega. The underlying research was reasonable, and therefore, the various Kodak representatives exercised the competence reasonably expected of those in the business or profession.

In addition, as discussed more fully in Section II.H *infra,* Omega failed to prove injury and damages cause by any Kodak statement or action or by the Ultralife battery itself. Besides the failure to prove actual damages, there is a distinct lack of causation between the alleged negligent misrepresentations and the claimed damages. Accordingly, Omega's claim for negligent misrepresentation fails.

## E. LANHAM ACT

■ In its Third Amended Complaint, filed four-and-one-half years after the commencement of the lawsuit, Omega, for the first time, added a claim for false advertising under the Lanham Act, 15 U.S.C. § 1125(a). Omega alleges in Count Eight that Kodak's representations in commercial advertisements, television spots, pamphlets and other promotional materials were materially false and misleading. (Dkt.# 246, ¶¶ 83–87). In its post-trial brief, Omega argued that "Kodak's advertisements, press conferences, and OEM Brochures and engineering specifications constituted advertisements or promotional materials intended for dissemination among the public. As such, they fall within the proscriptions of the Lanham Act." (Dkt. # 334, at 11 n. 1). Omega singled out the following advertisements as literally false: (1) the Ultralife was perfect for long intermittent use; (2) the battery had an impermeable case; (3) the battery had a ten-year shelf life. (*Id.* at 12). Omega claims that these statements were not only literally false but also intentionally deceptive, quoting from internal documents that (1) described the situation as "building a future disaster;" (2) showed battery tests that disclosed a "disastrous fall in performance at all drain rates;" and (3) described a "significant number of duds at every stage of incubation." (*Id.* at 13).

Kodak argues that Omega has no basis for recovering damages under the Lanham Act. Specifically, Kodak advances four arguments.

> First, Omega has no standing to sue Kodak under the Lanham Act because Omega did not compete with Kodak in battery manufacturing and has not otherwise been damaged by false advertising by Kodak. Second, Omega has not shown that Kodak made false statements in violation of the Lanham Act. Third, Omega has not shown that any such statements, even if they

were determined to be false, actually deceived Omega's customers or adversely influenced their buying decisions. Fourth, Omega has not shown that it was damaged by any such conduct.

(Dkt. # 336, at 45).

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1), provides for civil actions for false advertising as follows:

> Any person who, on or in connection with any goods ... uses in commerce any ... false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, ... or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities ... of his or her or another person's goods
>
> shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

■ In general, to establish a false advertising claim under § 43(a), a plaintiff must prove the following five elements:

(1) The defendant has made a false or misleading statement of fact.

(2) The false or misleading statement of fact in issue has actually deceived a substantial segment of the audience for the advertisement or has the capacity to deceive such segment.

(3) The deception caused by the statement in issue is material because it is likely to influence purchasing decisions.

(4) The plaintiff has been injured as a result of the defendant's false claims because of a potential decline in sales or loss of goodwill.

(5) The advertised goods traveled in interstate commerce.

DORIS E. LONG, UNFAIR COMPETITION AND THE LANHAM ACT, § 4.4 (1993)(footnote omitted); 1A R. CALLMANN, THE LAW OF UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES § 5.04 at n. 25.100 (4th ed. 1998 Supp.). *See also L & F Products v. Procter & Gamble Co.*, 45 F.3d 709, 711 (2d Cir.1995)("plaintiff must demonstrate either that the challenged advertisement is literally false, or, although literally true, that it is still likely to mislead or confuse consumers"); *Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298 (2d Cir. 1992) [ *"Johnson & Johnson"* ](plaintiff must show "that a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement"); *Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 771 (2d Cir.1984)(before calculating the amount of damages in a Lanham Act case, "causation must first be established").

■ "[T]he false advertising aspects of Section 43(a)—as originally framed in 1946 and as revised in 1988—were calculated to protect competitors or others with a comparably integral commercial interest but did not include ultimate consumers within the scope of the protected interest." *Serbin v. Ziebart Int'l Corp.*, 11 F.3d 1163, 1165 (3d Cir.1993). The Second Circuit has limited standing to assert a Section 43(a) claim to a "purely commercial class" of plaintiffs, specifically excluding consumers from bringing false representation claims under the Lanham Act. *Colligan v. Activities Club of New York, Ltd.*, 442 F.2d 686, 692 (2d Cir.), *cert. denied*, 404 U.S. 1004, 92 S.Ct. 559, 30 L.Ed.2d 557 (1971). Although a Section 43(a) plaintiff need not be a direct competitor, it is apparent that, at a minimum, standing to bring a Section 43(a) claim requires the potential for a commercial injury. *Berni v. International Gourmet Restaurants of America, Inc.*, 838 F.2d 642, 648 (2d Cir.1988) (citation omitted).

■ While standing is granted for injury to "purely commercial" interests, courts also look to the nature of the false representations to limit the availability of remedies available under the Act. Typically, Section 43(a) claims are "limited to false advertising as that term is generally understood." *Alfred Dunhill Ltd. v. Interstate Cigar Co.*, 499 F.2d 232, 237 (2d Cir.1974) (citation omitted). "In order for representations to constitute 'commercial advertising or promotion' under Section 43(a)(1)(B), they must be: (1)

commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services.... [and] (4) must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Gordon & Breach Science Publishers S.A. v. American Inst. of Physics,* 859 F.Supp. 1521, 1535–36 (S.D.N.Y.1994). Clearly, this case does not fit neatly into the Lanham Act.

■ The Court has found no cases dealing with the standing issue as it relates specifically to the "original equipment manufacturer" setting. In one sense, Omega appears to fit into that purely commercial class of plaintiffs who have standing to sue under the Lanham Act, alleging at least a potential for a competitive injury—Omega is in business and as such is a "commercial" plaintiff, albeit not in direct competition with Kodak. In another sense, Omega's claim appears to be that of a "distributor" of the Ultralife. In other words, because it incorporated the allegedly defective Ultralife into its products for resale, Omega claims that it suffered a commercial injury. Interestingly, in this manner, Omega would appear to suffer either an indirect injury from any alleged false advertising (assuming it can show that its own customers in turn "caught on" to the false advertising of Kodak and thereafter refused to purchase Omega products), or a corresponding *increase* in sales due to the consumer confusion that would inure to Omega's benefit. In yet another sense, however, by merely purchasing batteries, Omega essentially operated as a "wholesale consumer" of the Ultralife. Indeed, Omega's Lanham Act claim states that "Omega purchased Ultralife batteries in direct reliance on these [false] representations and on similar representations that Kodak employees made to Omega." (Dkt.# 246, ¶ 84). Consumer claims under the Lanham Act are disallowed in the Second Circuit. *Colligan,* 442 F.2d at 692–94. It is not *Omega's* reliance on Kodak's representations that establish a claim under the Lanham Act—it is the reliance of the consumers that in turn purchased the Omega hand held meters that would support any such claim. Thus, Omega may not rely on testimony of its own personnel to prove false advertising of the Ultralife under the Lanham Act.

In order to establish standing to sue ... a plaintiff must demonstrate a "reasonable interest to be protected" against the advertiser's false or misleading claims, and a "reasonable basis" for believing that this interest is likely to be damaged by the false or misleading advertising. The "reasonable basis" prong embodies a requirement that the plaintiff show both likely injury and a causal nexus to the false advertising....

This circuit has adopted a flexible approach toward the showing a Lanham Act plaintiff must make on the injury and causation component of its claim. We have held that, while a plaintiff must show more than a "subjective belief" that it will be damaged, it need not demonstrate that it is in direct competition with the defendant or that it has definitely lost sales because of the defendant's advertisements. However, we have also maintained that "[t]he likelihood of injury and causation will not be presumed, but must be demonstrated in some manner." The type and quantity of proof required to show injury and causation has varied from one case to another depending on the particular circumstances. On the whole, we have tended to require a more substantial showing where the plaintiff's products are not obviously in competition with defendant's products, or the defendant's advertisements do not draw direct comparisons between the two.

*Ortho Pharm. Corp. v. Cosprophar, Inc.,* 32 F.3d 690, 694 (2d Cir.1994)(multiple citations omitted)[ *"Ortho Pharmaceutical"* ]. "[I]n cases where there is no comparative advertising involved, the plaintiff must shoulder the full burden of proof of both cause in fact and injury." *Porous Media Corp. v. Pall Corp.,* 110 F.3d 1329, 1334 (8th Cir.1997)(footnote omitted)(without proof of causation and specific injury, each non-competing plaintiff

might receive a windfall unrelated to its own damage).

It is undisputed that Omega's products did not compete with Kodak's Ultralife battery at all and therefore Omega must meet the "more substantial showing" required of non-competitive plaintiffs. Omega failed to prove by a preponderance of the evidence that there was any customer confusion or dissatisfaction, lost sales, lost goodwill or other damages which resulted from Kodak's advertising the Ultralife. Omega failed to show any reasonable basis of injury or causal nexus to that advertising. No customers testified at trial that they had viewed any of Kodak's allegedly false advertising or that it had influenced their buying decision. No customers testified that they would be unwilling in the future to purchase Omega products due to Kodak's allegedly false advertising. In this case, as in *Ortho Pharmaceutical*, the "missing link" is evidence that Kodak's advertising has the effect on consumers that Omega says it does. "In other cases, this link has been supplied by consumer surveys or consumer witnesses." *Ortho Pharmaceutical*, 32 F.3d at 695. The only survey introduced at trial was offered by the defendants' expert, Dr. William Putsis, Jr. (Exh. 631). The Putsis survey indicated that customers were not less likely to do business with Omega because of Omega's association with Kodak's Ultralife battery.[24] (*Id.*). In addition, Kodak presented evidence that most, if not all, of Omega's alleged lost profits were probably a result of a general downturn in the market for process control instruments na-

tionally. (Exh. 635, at 11–12). Because Omega failed to present sufficient evidence on this issue, its Lanham Act claim fails for lack of reasonable basis of injury or causal nexus to the advertisement.

Omega argued that "[w]here the plaintiff establishes that an advertisement is literally false, the plaintiff need not prove consumer deception." (Dkt. # 334, at 11). The general rule is that a plaintiff must "demonstrate that a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement" in order to demonstrate injury resulting from the advertisement's message. *Johnson & Johnson*, 960 F.2d at 298. "However, we have held that 'where a plaintiff adequately demonstrates that a defendant has intentionally set out to deceive the public,' and the defendant's 'deliberate conduct' in this regard is of an 'egregious nature,' a presumption arises 'that consumers are, in fact, being deceived.'" *Id.* at 298–99 (citations omitted).

Omega has not demonstrated any deliberate intent by Kodak to deceive the public in connection with its advertisement of the Ultralife. To the contrary, Kodak adequately tested the Ultralife to acceptable scientific standards. Kodak business managers reasonably relied upon its engineering community to provide them with sufficient data from which to develop advertising. Kodak maintained adequate corporate safeguards to ensure accuracy in its advertising. There is simply nothing in the record to support Omega's claim that the advertisements were intentionally deceptive.[25] The presumption of

24. Question 16 asked: "Has your opinion of Omega Engineering changed for the better, the worse, or not at all as the result of Omega's association with the Kodak Ultralife Lithium battery?" Question 17 asked: "In the future, would you be more or less likely to purchase products sold by Omega Engineering as a result of Omega's association with Kodak's Ultralife Lithium battery?"

The overwhelming majority of people surveyed indicated there was no change of opinion for the worse or less of a likelihood of doing business with Omega. Coupled with the fact that the majority of people surveyed did not even know that Omega included the Ultralife in its hand held products, the Court is left with the impression that Omega did not introduce customer sur-

veys because they could not show any injury or causal nexus.

25. Omega points to three statements that allegedly show that Kodak "knew of the problems all along but continued to promote the battery as having the outstanding qualities" touted in their promotional materials which are said to form the basis of the Lanham Act claim. As discussed in Section I.G *supra*, the statement about "building a future disaster," taken in context, merely reflected Adams' frustration about a technical issue. (Exh. 46) The comment about a "disastrous fall in performance at all drain rates" (Exh. 57) referred to a manufacturing issue, not to any batteries that were actually sold. (9/12/96 Tr. at 177–78). The Preliminary Report entitled "Stability of the Lithium Nine Volt Battery" dated

consumer confusion does not transform the Lanham Act's false advertising prohibition into strict liability for good-faith, reasonable advertising claims that turn out to be unsupportable. For these reasons, the Court declines to extend the presumption of consumer confusion to the facts of this case.

 Even if Omega were able to show that Kodak's actions were so egregious so as to avoid proof of actual confusion, the Lanham Act claim would fail. That is because Omega did not prove that Kodak's advertisements were literally false.

A plaintiff's burden in proving literal falsity thus varies depending on the nature of the challenged advertisement. Where the defendant's advertisement claims that its product is superior, plaintiff must affirmatively prove defendant's product equal or inferior. Where, as in the current case, defendant's ad explicitly or implicitly represents that tests or studies prove its product superior, plaintiff satisfies its burden by showing that the tests did not establish the proposition for which they were cited. We have held that a plaintiff can meet this burden by demonstrating that the tests were not sufficiently reliable to permit a conclusion that the product is superior. The ... "sufficiently reliable" standard of course assumes that the tests in question, if reliable, would prove the proposition for which they are cited. If the plaintiff can show that the tests, even if reliable, do not establish the proposition asserted by the defendant, the plaintiff has obviously met its burden. In such a case, tests which

may or may not be "sufficiently reliable," are simply irrelevant.

*Castrol, Inc. v. Quaker State Corp.,* 977 F.2d 57, 63 (2d Cir.1992)(multiple citations omitted).

In evaluating the reliability of the tests, "[t]he fact-finder's judgment should consider all relevant circumstances, including the state of the testing art, the existence and feasibility of superior procedures, the objectivity and skill of the persons conducting the tests, the accuracy of their reports, and the results of other pertinent tests."

*Pfizer, Inc. v. Miles, Inc.,* 868 F.Supp. 437, 452 (D.Conn.1994) (citation omitted).

The typical backdrop for these "product superiority" claims involves competing products and not the original equipment manufacturer setting. However, the established case law provides a good blueprint for resolving the facts of this case. Omega claims that Kodak made false claims related to shelf life in its OEM Brochures. In the First OEM Brochure, the capacity retention chart contained language that it was based upon "estimated data from accelerated storage tests." (Exh. 15). The Court previously held, in Section I.C. *supra,* that the testing done by Kodak to establish the shelf life claims was "state of the art," and the most feasible way to establish capacity retention at the time it was done. In general, the internal reports produced by Kodak's engineering labs were quite candid about perceived or potential problems and, for the purposes of this lawsuit, the technical people were Kodak's harshest critics. (9/26/96 Tr. at 28–29). On the other hand, the reports were not con-

August 11, 1986 indicates that "there are a significant number of duds at every stage of incubation," however the batteries tested were hand built in July 1986 with "prototype equipment." (Exh. 19, at 6). The batteries tested were not production batteries which were manufactured under different circumstances with different production tolerances from the fully automated assembly line which produced the batteries. (9/12/96 Tr. at 118). The Court does not ascribe the same nefarious intent to these statements that Omega does. In context, they merely relate to manufacturing problems, an interpretation which is consistent with Kodak's assertion that

the Ultralife was never profitable due to low manufacturing yields.

In asking for an award of defendant's revenues, Omega cites "the need to demonstrate to Kodak that its half truths, its tricky little question and answer scripts and its outright deception is no way to do business." (Dkt. # 334, at 20). The Court does not share Omega's interpretation of the facts. Omega did not prove that there was any outright deception or half truths. As for the Q & A scripts, many careful businesses employ such devices to present a consistent face to the world (*i.e.,* precisely to avoid half truths and deceptions by employees singing out of different hymnals). (*See* 9/11/96 Tr. at 42–43).

trived or "beefed up" merely to support performance claims in advertising. Therefore the Court finds the technical reports supporting shelf life claims to be reasonably reliable. Accordingly, with respect to shelf life claims which appear to rely on product tests, Omega did not show by a preponderance that the tests were unreliable or that the tests did not support the advertising claims at the time they were made.

■■■■■ With respect to claims of impermeability and perfection for use in long intermittent use applications, the Court finds such statements, taken in context, were too ambiguous to be understood as representations of fact and represent statement of opinion. "Subjective claims about products, which cannot be proven either true or false, are not actionable under the Lanham Act." *Groden v. Random House, Inc.*, No. 94 CV 1074(JSM), 1994 WL 455555, at *5 (S.D.N.Y. Aug. 23, 1994) (citation omitted), *aff'd*, 61 F.3d 1045 (2d Cir.1995). The falsehood requirement cannot be met by the statement of an argument or opinion. Kodak's claim of impermeability was accompanied by statements about minute leaking and "tight seals." Omega presented insufficient evidence that the Ultralife cells were other than impermeable. Kodak reports discussing the permeability issue represented internal disagreement about the intercell leakage or the interconnect cover but did not definitively prove permeability. Thus, although there could have been a problem with permeability as discussed in the internal Kodak reports, Omega did nothing to bolster the claim in any other way. It presented no batteries into evidence. It presented no customer or credible expert testimony that the problems with leakage were anything other than a manufacturing problem. The fact that Kodak continued to experiment with cell design is not an admission that the Ultralife was not impermeable. It could merely represent Kodak's commitment to continuous improvement and customer satisfaction, goals shared by Omega according to testimony of Omega's principals.

Claims of perfection for a particular application or that Kodak "perfected" an impermeable design are statements of opinion, quite subjective and vague. In any event, Omega failed to prove that the Ultralife was anything but well-suited to long intermittent applications. *Summit Tech., Inc. v. High-Line Med. Instruments, Co.*, 933 F.Supp. 918, 931 (C.D.Cal.1996)(finding that, in context, the phrase "perfectly reliable" does not mean "100% reliable"); *In Re Century 21—RE/MAX Real Estate Adver. Claims Litig.*, 882 F.Supp. 915, 923 (C.D.Cal.1994)(statements that defendant is the "largest volume" real estate company, that it completed the "most total transactions," and that it had the "highest level of customer satisfaction" were too vague to be actionable).

Further still, even if Omega could establish standing, willfulness or falsity, the Court is not persuaded that it is entitled to any form of damages. *See* Section II.H *infra*. There was no evidence presented to connect any statements by Kodak (whether they be true, false, misleading or otherwise) to any purchaser of Ultralife batteries other than Omega. Thus there was no proof of lost profits or other damages specifically caused by Kodak's alleged false advertising. Additionally, Kodak rebutted the causation argument with evidence that any lost sales were probably due to the general downturn in the industry at the time.

■■■■■ Omega alternatively argued that it should recover damages based upon Kodak's profits; since Kodak apparently did not turn a profit on the Ultralife, Omega argues that an appropriate measure of damages would be the amount of revenue Kodak paid out in advertising expense. The parties agree that an award of damages based upon an accounting of defendant's profits will only occur where plaintiff can prove that defendant was guilty of bad faith or willful deceptiveness. *International Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*, Nos. 97-7761, 97-7799, 1998 WL 272634, at *4 (2d Cir. May 29, 1998); *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir.), *cert. denied*, 506 U.S. 991, 113 S.Ct. 510, 121

L.Ed.2d 445 (1992). An accounting of defendant's profits

> is rarely granted and appears to have been limited to situations in which the defendant's profits represent unjust enrichment derived from diversion of business that clearly would otherwise have gone to the plaintiff, such as in instances where the defendant palmed off its goods as made by the plaintiff or otherwise infringed the plaintiff's rights rather than engaged simply in false advertising of the defendant's own product.

*Burndy*, 748 F.2d at 772 (footnote omitted). The elements of willfulness and bad faith are not present in this case. Kodak acted reasonably in preparing its advertising campaign, and acted promptly and reasonably when it discovered that certain advertising claims became controversial within the organization. Moreover, this is not a case where any profits turned by Kodak "represent unjust enrichment derived from business that clearly would otherwise have gone to the plaintiff." *Id.* There were no claims of "palming off" or infringement. Thus, this is a particularly poor case for an award of defendant's profits. Similarly, this case is unsuited to any award of attorney fees under § 1117, as this was not an "exceptional case," nor does the Court find any evidence of "deliberate, wilful or bad faith violations of the Lanham Act." *Mobius Management Systems, Inc. v. Fourth Dimension Software, Inc.*, 880 F.Supp. 1005, 1026 (S.D.N.Y.1994).

## F. *CONNECTICUT UNFAIR TRADE PRACTICES ACT*

In Count Nine of the Third Amended Complaint, Omega alleges that "Kodak's breach of contract, covenant of good faith and fair dealing, and intentional and negligent misrepresentations are unfair and deceptive acts and practices. Kodak's conduct at issue in this complaint is immoral, unethical, oppressive and unscrupulous." (Dkt.# 246, ¶ 91). Therefore, plaintiff alleges that Kodak's acts, practices and conduct violate the Connecticut Unfair Trade Practices Act, CONN. GEN. STAT. §§ 42–110a through 42–110q. In its post-trial submis-

sion, Omega argues that "having established Kodak's false advertising, outright fraud, negligent misrepresentation, each of which requires a substantially higher burden than that needed for CUTPA has necessarily demonstrated the unethical and deceptive business practices required for relief under CUTPA." (Dkt. # 334, at 38). Kodak argues that Omega was unable to prove violations of CUTPA.

> It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the "cigarette rule" by the federal trade commission for determining when a practice is unfair:
>
> (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [ (competitors or other businessmen) ].

*Cheshire Mortgage Serv., Inc. v. Montes*, 223 Conn. 80, 105–06, 612 A.2d 1130 (1992)(multiple citations and internal quotations omitted).

Judge Dorsey granted summary judgment on Counts One and Two, finding that the alleged requirements contract was unenforceable. As found in Section II.B. *supra*, Omega did not prevail on its claims for breach of express warranty, breach of implied warranty of merchantability, and breach of implied warranty for a particular purpose. As found in Sections II.C & D *supra*, Omega similarly did not prevail on its claims for fraud and negligent misrepresentation. As found in Section II.E *supra*, Omega also did not prevail on its Lanham Act claims. Having already determined that Kodak's practices did not violate any of the statutory or common law claims brought by Omega, the Court is confronted with determining whether that same conduct offended some previously unmentioned public policy,

whether it is immoral, unethical, oppressive or unscrupulous.

 The question of whether an action or practice can be the basis of a CUTPA action depends upon all the circumstances of a particular case. *Jacobs v. Healey Ford–Subaru, Inc.,* 231 Conn. 707, 726, 652 A.2d 496 (1995). Not every consumer injury is legally "unfair" under CUTPA. "To justify a finding of unfairness the injury must satisfy three tests. It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided." *A–G Foods, Inc. v. Pepperidge Farm, Inc.,* 216 Conn. 200, 216, 579 A.2d 69 (1990) (citations omitted). In this case, Omega leveled some very serious charges against Kodak—charges that were not borne out at all by the evidence. The Court was clearly more persuaded by Kodak's argument that its actions were "fair and commercially reasonable" than Omega's interpretation that the conduct at issue was "at least recklessly indifferent, and more to the point—intentional and wanton." The Court finds that none of Kodak's conduct offended any previously unmentioned public policy, and was neither immoral, unethical, oppressive nor unscrupulous.

Omega put a sinister spin on many of Kodak's actions in development, testing, advertising, promoting and selling the Ultralife. Even if the Court were inclined to agree with Omega on even one aspect of liability in this case, which it does not, Omega has not proven a viable CUTPA claim. That is because, as set forth in greater detail in Section II.H *infra,* Omega did not prove any damages connected with the Ultralife battery.

Last summer, Circuit Judge José A. Cabranes, sitting by designation, summarized the law regarding damages under CUTPA as follows:

> To state a claim under CUTPA, plaintiff must demonstrate that he suffered "any ascertainable loss of money or property, real or personal," due to an unfair or deceptive practice. While the ascertainable loss is not necessarily equivalent to a precise figure of actual damages, this requirement "is a threshold barrier which limits the class of persons who may bring a CUTPA action." Under CUTPA there is no need to allege or prove the amount of the loss. However, ascertainable loss has been interpreted by the Connecticut Supreme Court as encompassing losses that are "measurable even though the precise amount of the loss is not known."
>
> "The burden of proving damages is on the party claiming them." ... "While the [Connecticut Supreme C]ourt ... did not require that the plaintiff ... prove a specific amount of damages, it did require that plaintiff show the existence of some loss or injury." After all, "CUTPA is not designed to afford a remedy for trifles." ...
>
> While it is "the intention of the legislature that this [statute] be remedial and be so construed," it does not follow that damages should be awarded when no loss of any kind has been alleged, much less proven.

*Madonna v. Academy Collection Service, Inc.,* 3:95 CV 875(AVC), 1997 WL 530101, at *10–11 (D.Conn. Aug. 12, 1997)(multiple citations omitted). Accordingly, Omega's claims under CUTPA also fails because it has not met the threshold test that it suffered "ascertainable loss."

### G. KODAK'S COUNTERCLAIMS

 In its Counterclaims, Kodak alleged that it announced its plan to discontinue the Ultralife in April 1990. It further alleges that it advised Omega that it might make Ultralife batteries available at an increased price of $5.00 each (rather than at the discounted rate Omega previously received of $2.09). Omega ordered batteries and two deliveries were made totaling 8,000 batteries at the invoice price of $4.59. Kodak alleged that Omega's failure to pay for the batteries constitutes either a breach of contract or unjust enrichment. (Dkt. # 247, at 15–17).[26]

---

26. Kodak only claims damages in connection with non-payment of 8,000 Ultralifes. Omega's Mangarella testified that the accurate number was 11,500. (9/24/96 Tr. at 173).

In its Reply to the Counterclaims, Omega denied that it agreed to pay the increased price but admitted that it received the shipments of batteries. Further, Omega admitted paragraph 5 of the Counterclaim, alleging that Omega "neither paid for the two shipments of Ultralife batteries nor returned them to Kodak." (Dkt. ## 44 & 50). Omega did not address Kodak's Counterclaims in its post-trial submissions.[27]

Since Kodak had announced its intent to discontinue the manufacture of the Ultralife as of April 5, 1990 (Exh. 181), Omega's purchase order for 200,000 units at a cost of $2.09 was merely an offer which Kodak was free to accept, reject or counteroffer. As an accommodation to Omega and the other OEM customers, Kodak decided to continue production of the Ultralife, but only at a break even price of $4.59. Kodak responded to Omega's purchase order in an acknowledgment, dated June 15, 1990, but included a different term, namely the price increase to $4.59. (Exh. 515). CONN. GEN. STAT. § 42a-2-207(1) provides: "a definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms ... different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the ... different terms." Kodak's acknowledgment operates as a rejection and counteroffer for the price of $4.59 per battery. Omega was free to accept or reject at that time.

After the June 15 acknowledgment was received at Omega, Omega's reaction was to remain silent in order to formulate its strategy. It was not until July 6, 1990 that Dr. Hollander responded that the price increase was "another way of saying the battery is not available." (Exh. 570). Six weeks later, and well after receipt of the first two shipments, Frank claimed to be "shocked" at the invoice price and indicated that if an agreement on

price could not be worked out, Omega was prepared to return the balance of the inventory. (Exh. 703). There was no mention of any battery defects at that time.

CONN. GEN. STAT. § 42a-2-601 permits a buyer of goods to reject or accept a whole or part of the goods delivered. To reject goods, a buyer must notify the seller "within a reasonable time after ... delivery" and rejection "is ineffective unless the buyer seasonably notifies the seller." CONN. GEN. STAT. § 42a-2-602(1). Omega did not seasonably notify Kodak of its intent to reject the Ultralife batteries. Seasonable notification of rejection required Omega to take immediate action under the circumstances of this case. By waiting to "formulate its strategy," Omega allowed Kodak to continue to manufacture the Ultralife battery probably with the hope that it could force concessions on price. Knowing that Kodak was specially manufacturing the Ultralife to fill orders for OEM's and that the batteries probably could not be resold, Omega's delay resulted in acceptance of the batteries. *Beco, Inc. v. Minnechaug Golf Course, Inc.*, 5 Conn.Cir.Ct. 444, 449–50, 256 A.2d 522 (App.Div.1968)(holding that buyer failed to make effective rejection within reasonable time where goods were delivered on June 24 and buyer attempted to return goods on July 29); *See also* 67 AM. JUR. 2D *Sales* § 649 (1985)("[R]ejection should occur and notice be given within a fairly short time after receipt of goods.... The buyer will have a shorter time in which to reject when inspection presents little difficulty")(footnotes omitted).

The Court finds that Omega ordered 8,000 batteries at a price of $4.59 and that a contract was formed at that quantity and price. Omega did not rightfully reject any batteries that it felt failed to conform by seasonably notifying Kodak within a reasonable time after delivery. Accordingly, Omega owes Kodak $36,720.

---

**27.** In his damage calculations, Dr. Gary French, Omega's damages expert, stated: "Omega believes that it should not be required to pay the $52,785 in invoices from Kodak for the last 11,500 lithium batteries Omega received. Rather, Omega should receive full credit for these invoices regardless of whether Kodak desires the return of the batteries." (Exh. 135, Tab W, Table 23, note c).

## H. OMEGA'S DAMAGE THEORIES

 Omega advanced several theories at trial and in its written submissions to the Court which are addressed here, notwithstanding the finding of no liability.[28] Dr. Gary French, an economist and senior vice president of Nathan Associates, was hired as Omega's expert on damages. (Exh. 211). Dr. French advanced several damage theories and Omega's lawyers proposed several other types of damages. Each is dealt with separately below. A few general observations are appropriate however.

> It is axiomatic that the burden of proving damages is on the party claiming them... When damages are claimed they are an essential element of the plaintiff's proof and must be proved with reasonable certainty.... Damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty.... Mathematical exactitude in the proof of damages is often impossible, but the plaintiff must nevertheless provide sufficient evidence for the trier to make a fair and reasonable estimate.

*24 Leggett Street Ltd. Partnership v. Beacon Indus., Inc.*, 239 Conn. 284, 308–309, 685 A.2d 305 (1996)(multiple citations omitted)(internal quotation marks omitted). The fundamental flaws in plaintiff's damage theories, coupled with the questionable credibility of its damage witnesses, clearly do not provide the Court, as trier of facts, with sufficient evidence to make a fair and reasonable estimate of damages even if plaintiff had prevailed on liability issues. With the flawed assumptions, lack of credibility, and contradictory evidence presented by defendant, it is clear that Omega failed to prove damages in connection with any of its claims.

### 1. LOST PROFITS

 Dr. French calculated damages for lost profits by first separating Omega's sales and product information into the four product categories: temperature, flow, pH and pressure measuring devices, for the years 1984 through 1992. Dr. French next compared sales of hand held instruments that once utilized the Ultralife (lithium products) with sales of other products (non-lithium products). The sales trend of lithium products appeared "distinctly lower" for the years 1990–92.[29] Dr. French undertook to determine the cause of this decrease. In his analysis, he eliminated from consideration the following: (1) all products from the pressure group; (2) the OmegaSays and certain other products with dramatic price increases during the relevant period; (3) all proprietary products; (4) all non-lithium products selling below $60.00; (5) all new, non-lithium products; and (6) all products that were discontinued in 1991 or 1992. Dr. French concluded that the only explanation for the poor sales figures in the lithium group was the lithium battery. (9/20/96 Tr. at 17–34; Exhs. 135 & 135A).

Dr. French calculated "what the lithium products sales would have been had they had sales similar to the non-lithium products." (Dkt. #333, at 97; Exh. 135, Tabs C–E, Table 3). From this point, Dr. French calculated gross revenue lost, incremental loss of profit, and net lost profit (after subtracting cost of goods sold and sales commissions). Next, Dr. French calculated lost sales of complementary products (products Omega would have sold with the lithium products). There are two types of lost complementary

---

**28.** When asked upon direct examination what relief Omega was seeking from the Court, Dr. Hollander candidly replied:

> None of us [is] looking for money. What we're looking for is the courts to recognize that this sort of business behavior can't be condoned and shouldn't be allowed. If we didn't stand up to Kodak, who would? The next time it could be even worse. We're happy that no one was hurt, to our knowledge, but what they

did is wrong. It is not the way the scientific community operates and that's why we're here.

**29.** Although Omega initially claimed damages for future lost profits in the amount of $2.55 million (Exh. 135, Tab A, Table 1), it withdrew its claim for future lost profits and a revised exhibit was admitted which reflected that the claim was withdrawn. (Exh. 135A).

sales: accessory (functionally related to the lithium product) and non-accessory (unrelated, but purchased with the lithium product). Dr. French's original lost profit damage calculations were adjusted "in accord with" the criticisms of Dr. Dov Frishberg, Kodak's economics expert. (Exhs. 645 & 645A). The revised calculations were presented in Exhibit 135A, as follows:

| | |
|---|---|
| Total lost net profits (1991) | $280,670. |
| Total lost net profits (1992) | $382,160. |
| | $662,830 |

(*See* Dkt. # 333, at 99).

Dr. Frishberg took exception to many of Dr. French's fundamental premises. The major flaw is that "Omega's lost profits calculation is based upon the assumption that any difference in the trend in sales between Omega's 9v Lithium battery powered instruments and other products sold by Omega (with certain adjustments) is wholly and solely attributable to the fact that Kodak withdrew from the 9v Lithium battery market in 1990." (Exh. 635, at 2, ¶ 5). "Omega's expert has not satisfactorily established that the withdrawal of the battery is the cause of any difference in sales trends" between lithium and non-lithium products. (*Id.* at 3, ¶ 7). "To support a claim such as that made by Omega it is necessary, at the very least, to demonstrate the sales trend of 9v battery powered instruments and all other products sold by Omega follow a similar pattern over time *until* the withdrawal of the 9v lithium battery disrupted such patterns. This comparison was not made by Omega in its calculation of damages." (*Id.*)(emphasis in original). Dr. French's inability to meaningfully isolate the Ultralife as the cause of any difference in sales between lithium and non-lithium products renders any lost profits calculation highly suspect and fundamentally unsound.[30]

This is especially true given what appears to be an overall downturn from 1991 to 1992 in the sales of "process control instruments" as reported by the U.S. Department of Commerce. As Dr. Frishberg pointed out in his report, "if trends in the sale of 9v Lithium battery powered devices by Omega are comparable to [the Department of Commerce trends for process control instruments], in general, then in three categories (temperature, flow and pH) sales by Omega equal or exceeded those which are indicated by such trends." (Exh. 635, at 3, ¶ 7). Even Dr. French alluded to a "recession" accounting for lowered product sales. (9/20/96 Tr. at 80). Thus it appears just as likely that the general downturn was reflected in the overall decline in sales for Omega; without more evidence, it is artificial to conclude that the decline was due to the Ultralife.

Dr. Frishberg made other significant criticisms of Dr. French's damage theory and calculation, including: (1) the lost profits basis of calculation was "polluted;" (2) the effect of "customer shift" to non-lithium products could cause an erroneous "double loss" of sales under Dr. French's analysis; (3) the statistical variance analysis of the positive effect in the pressure group of products (which led Dr. French to disqualify it from further analysis) renders any further analysis in the three remaining groups highly suspect; and (4) the profit margins were unreasonably high given that gross profit margin rather than operating profit margin was used and the impact of the lithium battery's higher costs was ignored. (Exh. 635, at 4–9). Such criticisms are well-taken and further render Dr. French's lost profit calculation highly suspect. Clearly, Omega has not carried its burden of proof with respect to damages for lost profits.[31]

---

**30.** To the extent damages for lost profits are not based upon the withdrawal of the Ultralife but rather on the defective nature of the battery, the same fundamental criticisms apply with equal force. There was simply insufficient proof of a connection between the lithium battery and the damages claimed by Omega. As Dr. French testified: "I can't separate out the impact I'm measuring, from the withdrawal, and from the impact of any actual or alleged defects." (9/20/96 Tr. at 81).

**31.** The rather remarkable admission by Dr. French on cross-examination, that his calculation of more than $180,000 for "lost complement product sales" was "suspect" (Exh. 135, Tab T, Table 20; 9/20/96 Tr. at 104–12), also served to undercut his credibility with respect to the lost profits and other aspects of his damages analysis, especially in light of the fundamental and reasonable criticisms leveled by Dr. Frishberg.

## 2. LITHIUM BATTERY ACQUISITION

■ Dr. French included as damages "the difference Omega paid for the lithium battery as opposed to what it would have paid for the same number of alkaline batteries." (Dkt. # 333, at 98). These calculations are set forth in Exhibit 135, Tab W, Table 23.[32] Omega claims, as a fundamental premise to this item of damages, that the lithium batteries performed no better than the alkaline batteries. Kodak contends that this damages claim "assumes that Omega received *no value whatsoever* from the Ultralife batteries." (Dkt. # 336, at 37)(emphasis added). Kodak misconstrues Omega's claim. It does not claim no value whatsoever; it merely claims no value above the cost of an alkaline battery justifying the premium charged for the Ultralife, based upon the alleged comparable performance characteristics.

However, Omega's damage claim related to lithium battery acquisition fails for lack of proof of one premise upon which it rests. In order to prevail on this claim for damages, Omega must show that the Ultralife was no better than the alkaline battery. First, there was no proof presented regarding the performance characteristics of an alkaline battery from which one could compare the Ultralife. Second, with the exception of a very limited comparison of Ultralife and alkaline batteries by Jobaggy, there was no proof that the performance characteristics of the Ultralife batteries delivered to Omega were "no better" than alkalines (9/25/96 Tr. at 26; Dkt. # 333, at 86), whereas Kodak tests repeatedly showed superior performance of the Ultralife so as to back up its performance claims. Finally, Omega's own limited testing in July and October 1990 showed the Kodak batteries were "much superior" to the alkaline batteries against which they were tested. (*See* Sections I.C & I.E *supra*; 9/25/96 Tr. at 50).

In addition, Omega's premise was undercut by the Putsis survey data on customer's attitudes. In order to prevail on this damage theory, even if the performance characteristics between the Ultralife and alkaline batteries were only roughly equal, Omega would have to show that the inclusion of the Ultralife battery did not have a favorable impact on customers' attitudes or that customers did not receive some additional value from Omega's inclusion of the Ultralife in its instruments. According to Dr. Putsis, customers did believe they received some additional value.[33] Moreover, Dr. French testified he was aware Omega hoped to obtain value by including the U9VL, "but whether they actually did I don't know for certain." (9/20/96 Tr. at 80). He did not testify that customers did not obtain value. Accordingly, Omega's damage theory with respect to lithium battery acquisition damages suffers from a fundamental lack of credible proof.

**32.** The calculation of damages under this theory is peculiar. Omega claims that it could have purchased alkaline batteries as replacements for $.76. This contention is without proof, but is also without objection from Kodak. However, Kodak claimed that price pressure only permitted it to charge 1.5 to 1.8 times the "going price" for alkalines. (9/13/96 Tr. at 184). At $2.09, the going price for alkaline batteries should have been greater than $.76. Therefore, either Omega's damages under this theory are overstated or Kodak was charging way too much for its Ultralife.

In addition, Dr. French testified that he relied on data supplied by Mangarella to calculate the number of alkaline batteries Omega could have purchased instead of Ultralifes. However, he was unable to state with certainty whether the calculation included any or all of the "free" Ultralifes given to Omega early on in the relationship (although he was reasonably sure that he wasn't calculating damages on free batteries.). (9/20/96 Tr. at 90–95). In response, Mangarella testified that he only supplied Dr. French with information on batteries that were invoiced. (9/24/96 Tr. at 156).

**33.** The Putsis survey is far from overwhelmingly conclusive, and appears to suffer itself from several flaws. (*See* Dkt. # 333, at 87–91). The argument advanced by Kodak that it would have been irrational for Omega to provide the Ultralife without an attendant cost increase passed along to its own customers is unavailing. It is perfectly conceivable that Omega could have anticipated an attendant increase in its sales volume for offering an instrument with a lithium battery where its competitors might not. Or it could have offered the instrument with the Ultralife in order to better serve its customers hoping for increased customer loyalty. (9/25/96 Tr. at 140–41).

### 3. HANDBOOKS AND NEW HORIZONS

A major element of Omega's claimed damages relate to the costs associated with the Handbooks and New Horizons publications. Those damages are set forth in Exh. 135, Tabs X & Y, Tables 24 & 25.[34] The methodology used to determine this aspect of damages was to calculate the total "printing and paper cost per selling page" added to the "prep[a]ration cost per page" added to the "internal department cost per page" multiplied by the "number of pages affected" to arrive at the overall "cost of affected pages." (Tab X, Table 24). In other words, Omega determined what it cost to print a single page of advertising (paper, preparation, internal costs), and then isolated each page containing references to the Kodak Ultralife battery, and assigned a cost to those pages. In addition, Omega assigned a proportional "distribution cost" associated with the cost to distribute the "damaged pages." (Tab Y, Table 25).[35]

Dr. Frishberg criticized this approach in two ways. First, he stated that the appropriate measure of damages would not be the cost associated with *adding* the references to the Ultralife battery to its publications, but rather the cost to *remove* such references. (Exh. 635, at 9–10, ¶ 14). Dr. French and Omega personnel testified that they were not interested in drawing further attention to the situation, and Omega decided against a separate mass mailing informing customers of the unavailability of the Ultralife and so that was not a viable option for business reasons. (9/20/96 Tr. at 121–23). Rather, Omega included an insert with products which formerly included the Ultralife, explaining that the U9VL was "no longer available due to the recent discontinuance of production by Kodak." (9/24/95 Tr. at 122; 9/25/96 Tr. at 169–73; Exhs. 532–33). On the other hand, Anne Mesereau, an assistant director of marketing at Omega, testified at deposition, which was admitted into evidence (Exh. 740), that there was no incremental cost associated with deleting the references to the Ultralife in subsequent editions of the handbooks because each affected page was altered in various other respects. (Exh. 740, at 50–51, 98–102, 105, 115–18, 127–28, 183, 216–17) Second, Dr. Frishberg criticized the damage component related to distribution costs because "no additional distribution of handbooks was necessitated by the withdrawal of Kodak's 9v Lithium battery, and new handbooks were produced and distributed at regular intervals." (Exh. 635, at 10, ¶ 13).

The approach Omega took to recover costs associated with advertising the Ultralife vastly overstates any damages. First, because there were many references on each page unrelated to the Ultralife, the cost for that page would not be borne entirely by a defendant found liable for any claims. The per page cost would have to be further broken down to only that related to the Ultralife. Otherwise, Kodak would be paying in damages more than what Omega incurred as costs for which it sought under its claims. And although Mersereau testified that there was no way to isolate merely the additional costs associated with inclusion of the Ultralife (Exh. 740, at 105), the reality is that any such costs would be minimal at best (*i.e.*, the cost of one photograph of the Ultralife, the time it took to layout only that portion of the particular page in which the Ultralife appeared, etc.).

Second, similar to the discussion regarding battery acquisition damages, for Omega to prevail on this damage theory it would have to show that the advertising had no positive effect for Omega. As Kodak pointed out, Omega made no effort to analyze that aspect

---

**34.** The underlying data was all provided by Omega, and Dr. French was permitted to testify, over objection, *as to the meaning of the data* "subject to connection up by an Omega witness at a later time. To the extent that the bottom layer of the house of cards does not hold up, ... obviously the house would then collapse." (9/20/96 Tr. at 59–61).

**35.** Interestingly, Omega uses a fully allocated cost-per-page in calculating damages associated with advertising the Ultralife, but somewhat less costs deducted from the profit margin calculations in the lost profits claim.

of its damage theory for trial. (Dkt. # 336, at 38).

Third, to the extent Omega claims damages for advertising for fraud in connection with Kodak's failure to advise it of its impending exit from the battery business, a significant portion of such damages fails for lack of proof. That is because Omega did not establish a basis for what its publication deadline was for the 1990 handbooks. There was evidence that Kodak did not finalize its decision to exit the battery business until late 1989 or early 1990. As pointed out by Kodak, it is conceivable that the decision to exit the battery business was made after the 1990 handbook production deadline, and therefore damages for any fraud for failure to advise Omega of its plan would have to be adjusted accordingly.

Finally, the Court agrees with Dr. Frishberg's criticisms that the true measure of damages for Omega's advertising would have been the costs to remove the Ultralife from the next editions of the handbooks. Since there were no incremental costs associated with deleting the references to the Ultralife, and since Omega presented no evidence of costs associated with any "curative" notice, Omega's advertising damages fail for lack of foundation and lack of proof. To the extent the advertising that was included harmed Omega's reputation, that aspect of damages is dealt with separately below.

### 4. RETROFITTING

■ Mangarella testified that Omega removed the Ultralife from its hand held instruments and retrofitted its stock—it had five people working full time "for weeks" on the project. (9/24/96 Tr. at 122). In addition, Omega told its suppliers to remove the Ultralife batteries from products into which the battery was to be incorporated. (*Id.* at 123).[36] Omega also printed a notice that Omega products would no longer be supplied with the Ultralife. (9/24/96 Tr. at 122). Although there was testimony about the efforts associated with retrofitting, nowhere did

Omega attempt to quantify its damages in this area. Accordingly, even if the Court were inclined to find liability on any claim for which retrofitting damages were available, the absence of specific data precludes an award based upon the costs of retrofitting in this case.

### 5. CUSTOMER RETURNS

■ Omega contended that the return of instruments related to technical problems with the battery "numbered in the thousands." (Dkt. # 334, at 18). Mangarella collected all reports of customer returns where the word battery was used in the customer's reason for returning the product, and he analyzed the customer return trends. (9/24/96 Tr. at 188). Mangarella's return report was admitted as Exh. 506.

Although there appear to be some returns related to battery defects, the return report is inherently unreliable as proof of damages. That is because the return report includes any return transaction that mentions the word "battery." In most instances, it is impossible to determine if the battery in the returned instrument was an Ultralife, and in some, it is quite clear that the battery was not an Ultralife. For example, in the very first entry on the first page of the report, the "battery" defect merely mentions "1.5 V Batteries." The Ultralife is a 9 volt battery. In another instance on that first page, it appears that an Omega product was "shipped in error" and involved a "missing battery charger." The Ultralife is not a rechargeable battery and Kodak expressly voided any guarantees "if the battery is recharged." (*See, e.g.,* Exh. 115, at Bates # 004738). Nearly every page of Mangarella's report contained similar flaws. Thus, without more evidence, the testimony of Mangarella and the battery report is insufficient evidence to prove damages related to customer returns.

### 6. DEFECTIVE BATTERIES

Besides the customer returns, Omega claimed that it had many defective batteries in its inventory. Kodak defended, in part, by

---

36. The batteries returned from suppliers were placed into a storage area with all the other inventory and batteries pulled from stock in the retrofitting exercise. (*Id.*).

**268**

contending that Omega did not offer any evidence of defective batteries that "failed to comply with any express warranties and details regarding those failures." (Dkt. # 336, at 64). That is not entirely true. As discussed in Section I.H *supra*, Jobaggy identified 297 batteries that tested below nine volts, two batteries that appeared to leak, 397 batteries that had greater than six ohms resistance and thirty-nine batteries that failed to deliver appropriate service life at various load conditions. (*See generally* 9/25/96 Tr. at 17–38). Thus, Omega identified 735 batteries that failed to comply with the warranties that Omega believed were in effect.

The Court is confronted with an incomplete, slightly unorthodox testing of batteries by a non-expert after the litigation had been filed. No defective batteries were offered as evidence. No expert testimony was offered with respect to particular batteries that Omega felt were defective. The tests were conducted against the original specification and not the updated specifications in effect for the batch of batteries tested. The results of the test were analyzed by Jobaggy incorrectly. The batteries were tested against drain rates that were atypical for Omega applications. In sum, as a *matter of proof*, the Jobaggy tests were insufficient to prove damages for breach of warranty for shelf life claims.

### *7. REPUTATION*

 Omega appears to claim damages to its goodwill and reputation in connection with the claim made under the Lanham Act; however, the argument is intertwined with the argument seeking defendant's profits. Omega's argument is that its customers were clearly interested in getting a superior product—the Ultralife with the advertised characteristics—and Omega unknowingly passed on Kodak's false representations. Because "at least 55% of Omega's customers had technical problems with the battery," and returned the Omega instrument, one can "reasonably

conclude that other Omega products failed and that customers blamed Omega rather than Kodak. This evidence of lost goodwill obviously translates into lost sales and lost profits." (Dkt. # 334, at 18–19). Thus, to the extent that Omega claims damages to its reputation, it appears to include such damages in the calculations of Dr. French for lost profits. In the absence of any separate evidence of lost reputation (*i.e.*, testimony of Omega customers), any claim for damage to Omega's reputation apart from its lost profits theory fails for lack of proof.

### *III. CONCLUSION*

Accordingly, for the reasons stated above, judgment shall enter for defendant Kodak on Omega's Complaint and for Kodak on its Counterclaim in the amount of $36,720.[37]

---

**37.** As indicated at the conclusion of trial, the Magistrate Judge commends James R. Fogarty, Esq., W. James Cousins, Esq., and Harold A.

Kurland, Esq., for the exemplary manner in which they conducted themselves during the course of this trial. (9/27/96 Tr. at 240–41).